**Emmett R. DAVIS, et al., Plaintiffs–Appellees, Cross–Appellants (90–3587/3881),**

v.

**The MUTUAL LIFE INSURANCE COMPANY OF NEW YORK (90–3560/3879); Trans World Assurance Company (90–3561/3878), Defendants–Appellants, Cross–Appellees,**

**Donald S. Fletcher; Fletcher Insurance Associates, Defendants.**

Nos. 90–3560, 90–3561, 90–3587, 90–3878, 90–3879 and 90–3881.

United States Court of Appeals, Sixth Circuit.

Argued Jan. 27, 1992.

Decided Sept. 21, 1993.

Michael G. Florez; and William H. Blessing (argued and briefed), Markovits & Greiwe, Cincinnati, OH, for plaintiffs-appellees, cross-appellants.

Timothy S. Black (argued and briefed), Cincinnati, OH, for the Mut. Life Ins. Co. of New York.

Timothy P. Heather (argued and briefed), Benjamin, Yocum & Heather, Cincinnati, OH, for Trans World Assur. Co.

Before: KENNEDY and GUY, Circuit Judges; and ENGEL, Senior Circuit Judge.

ENGEL, Senior Circuit Judge.

Two life insurance companies—The Mutual Life Insurance Company of New York ("MONY") and Trans World Assurance Company ("TWA")—appeal from a jury verdict finding each liable for common law fraud, breach of fiduciary duty, breach of contract, and violations of the Ohio Consumer Sales Practices Act ("CSPA"), OHIO REV.CODE ANN. § 1345. In addition, MONY appeals the jury's finding that it was liable under the federal Racketeer Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 to 1968, and both insurance companies appeal the district judge's award of attorney's fees. Finally, in a cross-appeal, Emmett R. Davis, one of the 29 individual plaintiffs below, offers four grounds to challenge the district court's award of damages.[1] For the following reasons, we affirm in part and reverse in part.

## I.

This controversy arises out of the highly effective—albeit fraudulent—method by which Donald S. Fletcher sold life insurance policies. This is not the first time this court has reviewed an action arising out of Mr. Fletcher's scheme. *See Hofstetter v. Fletcher*, 905 F.2d 897 (6th Cir.1988).

In 1980, after four years of remarkably successful sales as an agent for New York Life Insurance Company (not a party to this action), Fletcher and his associates began selling policies for MONY. Three years later, he dissociated himself from MONY and began to sell insurance for TWA. The 29 plaintiffs each purchased MONY or TWA policies through Fletcher's operation in Ohio. In *Hofstetter*, we summarized Fletcher's "fraudulent sales tactic to sell life insurance policies:"

> [Fletcher] travelled throughout the country selling life insurance by emphasizing tax advantages. According to Fletcher, potential investors could drastically reduce and even eliminate their federal income tax liability by purchasing a life insurance policy in conjunction with the formation of a home-based business. Fletcher informed investors that they could write off almost all of their household expenses and attribute them to deductible business expenses. Fletcher also promised to assist the investors in the filing of their annual income tax forms [and to provide tax audit protection]. In order to participate in this tax/insurance program, the investor was required to purchase life insurance policies from Fletcher by paying annual premiums equal to one-half of the client's income tax for the previous year. The client was also required to become involved in a home-based business and to invest the equivalent of the other half of the preceding year's tax payment in the home-based business.

*Id.* at 900. Fletcher then prepared federal withholding (W–4) forms for his clients listing enough exemptions to reduce to zero the taxes withheld from their paychecks. He also arranged for the automatic withdrawal from their checking accounts of amounts equal to half the sums that had been with-

---

**1.** Plaintiffs concede that, as Davis is the only cross-appellant named in the notice of appeal, he is the only cross-appellant whose claims are properly before this court. *See Torres v. Oakland Scavenger Co.*, 487 U.S. 312, 108 S.Ct. 2405, 101 L.Ed.2d 285 (1988); *Jones v. Cassens Transport*, 982 F.2d 983, 984 (6th Cir.1993).

held previously. These monies were used to pay the required insurance premiums. Fletcher and his associates then prepared his clients' federal tax returns, which claimed such liberal deductions for "business expenses" (which were, in fact, largely personal expenses) that virtually no tax was owed. Fletcher further promised his clients that, should the IRS audit any of their tax returns, he would provide "audit protection" or "prepaid legal care." Through this scheme, Fletcher sold to numerous investors, including the plaintiffs, MONY policies from 1980 until 1983, and TWA policies from 1983 until 1985.

Eventually, the scheme unraveled. The IRS audited each plaintiff's tax return and discovered that, relying on astounding deductions for home-based businesses, the plaintiffs had underpaid their federal income tax for several years. The IRS, determining that the deductions were mostly invalid, assessed hundreds of thousands of dollars in additional taxes, penalties, and interest. Fletcher and his associates repeatedly assured the plaintiffs that the IRS would eventually drop the audits. The IRS, of course, persisted and enforced its assessments.

Seeking to recover damages compensating them for these unexpected IRS assessments, the plaintiffs brought this action alleging that they were bilked by Fletcher's confidence game. The complaint listed several causes of action—including RICO violations predicated on fraud, and several Ohio common law and statutory violations—and named four defendants: Fletcher, his insurance agency, known as Fletcher Insurance Associates ("FIA"), and the two appellant insurance companies, MONY and TWA. After a trial, a jury found all four defendants liable under each state law claim. Each defendant was found liable for common law fraud; breach of its fiduciary duty to the plaintiffs; breach of its contract to help the plaintiffs avoid income tax liability by legal means; and for committing unfair, deceptive and unconscionable acts in violation of the Ohio CSPA. In addition, the jury found that Fletcher and MONY, but not TWA, had violated RICO, 18 U.S.C. § 1962(c), and it found that Fletcher and FIA had engaged in a common law conspiracy. Based on the jury's findings, the district court awarded the plaintiffs $3,587,274 in damages. The court adjudged each defendant jointly and severally liable for certain portions of the judgment, and apportioned liability for the remainder. Finally, the district court, finding authority in both RICO and the Ohio CSPA, awarded the plaintiffs $951,307.72 in attorneys' fees and expenses.

After the jury announced its verdict, MONY and TWA moved for judgment notwithstanding the verdict and for a new trial. The district court issued an order denying these motions, and each insurance company now appeals that order, along with the judgment and the court's Order Awarding Attorneys' Fees. In addition, one plaintiff, Emmett R. Davis, brings a cross-appeal. Neither Donald S. Fletcher nor FIA is a party to this appeal.

## II.

### A. State Law Claims

At trial, each defendant insurance company asserted its immunity from liability arising from Donald Fletcher's tax preparation activities. Fletcher, they argued, was authorized only to sell life insurance, and they bore no responsibility for unauthorized activities such as tax preparation. Unpersuaded, the jury found each company vicariously liable for common law fraud, breach of contract, breach of fiduciary duty, and violations of the Ohio CSPA—all in connection with Fletcher's tax and insurance program. On appeal, both TWA and MONY challenge those findings. Their arguments, which largely overlap, are essentially two-fold: First, they argue that the district court erred by improperly instructing the jury regarding a principal's liability for its agents' conduct, and that the court compounded its error by refusing to furnish the jury with a requested instruction regarding the law of independent contractors. Second, MONY and TWA assert that the district court's misstatement of agency law was prejudicial because the plaintiffs presented evidence insufficient to support the jury's finding that Fletcher and his associates acted with MONY's or TWA's express, implied, or apparent authority when they prepared the fraudulent tax returns.

## 1. Jury Instructions

Where an appellant challenges jury instructions, we reverse only where the instructions, *considered as a whole,* are confusing, misleading, or prejudicial. *Leila Hospital and Health Center v. Xonics Medical Systems, Inc.,* 948 F.2d 271, 277 (6th Cir. 1991). A simple reading of the challenged instructions demonstrates that none of these conditions obtain. Rather than reading the instructions as a whole, the appellants object primarily to one sentence, namely, the court's instruction, with regard to the state law claims, that "[a]n insurance company which fails to adequately supervise its agents is directly liable for the agents' conduct." *Davis v. Mutual Life Insurance Company of New York,* No. C–1–87–0727, slip op. at 14 (Nov. 28, 1990) (Jury Instructions). That instruction, they argue, misstates Ohio law by failing to explain that an agent's unlawful conduct binds his principal only if performed *within the scope of the agent's authority,* suggesting instead that each insurance company is directly liable for *any and all* of Donald Fletcher's conduct. Indeed, as MONY and TWA argue, that sentence, abstracted from the whole, fails to explain that vicarious liability attaches only to acts that an agent performs within the scope of his authority. Read *in toto,* however, the instructions explicitly emphasize that crucial qualification. The challenged instruction, entitled "Claim Against the Insurance Companies," for example, provides in pertinent part:

> The acts of the [sic] Donald Fletcher, Evelyn Johnson, or other insurance agents are binding upon MONY and Trans World, as the case may be, *only if their acts were done within the scope of their express, implied, or apparent authority.* An insurance company which fails to properly supervise its agents is directly liable for the agents' conduct.
>
> I instruct you that a person who solicits an application for life insurance shall be considered the agent of the company that issues the policy and not the agent of the person insured.

Jury Instructions, slip op. at 14 (emphasis added). The next instruction, moreover, labeled "Liability of Principal for Acts of Agents—Scope of Authority," adds:

> The insurance companies are not bound by the acts of Donald Fletcher, Evelyn Johnson, or any other agents *if they acted beyond the limitations of their authority* and where the plaintiffs, relying on such acts, actually knew, or reasonably should have known, of the limitations or lack of authority to act on behalf of the insurance companies.
>
> An agent is acting within his "scope of authority" when such acts are done in the execution and furtherance of the principal's business and when his actions are expected in view of the duties authorized by the principal. A principal may not be held liable for the acts of its agents if the conduct in question has no relationship to the conduct of the principal's business or the conduct is so divergent that its very character severs the relationship between principal and agent.

Jury Instructions, slip op. at 16 (emphasis added). These instructions speak for themselves. They explicitly state that the insurance companies are not bound by an agent's act performed outside his authority, and we fail to see how any attentive juror would not understand that an agent's unlawful conduct binds his principal only if performed within the scope of his authority.

Nor are we persuaded by the appellants' second argument, which asserts that the district court erred by failing to give their requested instruction regarding the law of independent contractors. MONY and TWA requested an instruction entitled "Independent Contractor," which stated:

> The defendants, MONY and TWA, have claimed that Donald Fletcher was an independent contractor. An independent contractor has the right of control over the performance of his work and methods he uses. A life insurance agent who works in the capacity of an independent contractor carries on an independent business and agrees to perform a specific task without direction or control of the company who appointed him.

Instead, the court simply instructed the jury "that a person who solicits an application for

life insurance shall be considered the agent of the company that issues the policy and not the agent of the person insured." Jury Instructions, slip op. at 14. That instruction is entirely consistent with Ohio statutory law, which provides that "[a] person who solicits insurance and procures the application therefor shall be considered as the agent of the party, company, or association thereafter issuing a policy upon such application or a renewal thereof." OHIO REV. CODE ANN. § 3929.27. *See also Damon's Missouri, Inc. v. Davis*, 63 Ohio St.3d 605, 590 N.E.2d 254, 257–58 (1992) (Section 3929.27 "was designed to protect an insured by imputing conduct of a soliciting agent to the principal, the insurer."); *Saunders v. Allstate Ins. Co.*, 168 Ohio St. 55, 5 O.O.2d 303, 151 N.E.2d 1, 4 (1958). Thus, while soliciting insurance for MONY, and for TWA thereafter, Fletcher was, as the district court informed the jury, an agent of the particular insurance company. The requested instruction would have been at best superfluous and at worst inconsistent with Ohio law. The critical questions were, as the court properly instructed the jury, whether Fletcher's unlawful conduct lay beyond the scope of his actual or apparent authority, and, if it did, whether the insurance companies nonetheless ratified it. Accordingly, we find no error in the district court's refusal to instruct the jury as requested.

### 2. Sufficiency of the Evidence

#### (a) MONY

We next address MONY's challenge to the sufficiency of the evidence regarding its vicarious liability. MONY maintains that the plaintiffs presented no evidence at trial from which the jury could reasonably have concluded either that Fletcher or his associates were acting with its authority in preparing the plaintiffs' taxes, or that MONY ratified Fletcher's conduct.

■ We accord substantial deference to jury verdicts. We may neither weigh the evidence, pass on the credibility of the witnesses, nor substitute our judgment for that of the jury. *Marsh v. Arn*, 937 F.2d 1056, 1060 (6th Cir.1991). Rather, we must view the evidence in the light most favorable to the appellees, drawing all reasonable inferences in their favor. *Id.*

■ Viewing the evidence in that light, we hold that the jury could reasonably conclude that Donald Fletcher remained within the scope of MONY's apparent authority when he offered to provide tax preparation services in conjunction with the sale of MONY life insurance policies, or that MONY bound itself by ratifying Fletcher's actions. As the district court properly instructed the jury, MONY was bound by the acts of Fletcher and his associates on the basis of apparent authority if the plaintiffs established that MONY's own conduct caused them reasonably to believe that MONY had authorized those agents to provide tax preparation services, and that the plaintiffs, in good faith, reasonably relied upon such authority. In addition, the district court properly instructed the jury that MONY was bound by its agents' acts even if such acts exceeded their actual or apparent authority, provided MONY *ratified* such actions. Ratification occurs where the principal receives and retains the benefits of a transaction with full knowledge of all material facts. *Meyer v. Klensch*, 114 Ohio App. 4, 18 O.O.2d 261, 175 N.E.2d 870, 872 (1961). MONY clearly received and retained the benefits of Fletcher's transactions with the plaintiffs each time it accepted a premium payment for a life insurance policy that Fletcher sold.

The plaintiffs, moreover, presented ample evidence that MONY management officials were fully aware of Fletcher's scheme. Fletcher's former partner, for example, testified that he and Fletcher described their tax and insurance program in detail at the outset of negotiations; that MONY officials attended tax seminars and listened to Fletcher's sales presentation, and were fully aware of all aspects of the operation. The plaintiffs also uncovered and introduced a virtual smoking gun: an internal report, prepared by a MONY attorney during negotiations between MONY and Fletcher, that described Fletcher's program in detail, calling it a "fast-track hustle." Although the report advised company officials that the tax and insurance program violated the law, the company appointed Fletcher as its insurance

agent and Sales Manager. In addition, the plaintiffs presented evidence that MONY management personnel participated in training workshops for Fletcher's organization and recruited their own employees to work in the combined tax and insurance program. Furthermore, the evidence showed that MONY ignored warnings from its own corporate counsel that Fletcher was providing misleading tax information, warnings from its own agent that Fletcher's program involved "a lot of broken promises," and warnings from numerous policyholders that Fletcher was conducting a "con game" or "scam."

In short, the plaintiffs presented evidence from which the jury could reasonably conclude that MONY officials were fully aware of Fletcher's scheme as MONY reaped its benefits, thereby ratifying his conduct. Moreover, by presenting evidence that MONY held Fletcher out as Sales Manager and sponsored, promoted and participated in his seminars, the plaintiffs presented sufficient evidence to support a finding that MONY bound itself by clothing Fletcher with apparent authority. We have little difficulty in affirming both the verdict and the district court's denial of MONY's motion for entry of judgment notwithstanding the verdict or for a new trial.

**(b) TWA**

In comparison to the evidence supporting MONY's vicarious liability, the evidence that TWA authorized or ratified Fletcher's tax preparation services in conjunction with sales of *its* life insurance is rather meager. Accordingly, a majority of this panel concludes

that the district court's order denying TWA's motion for judgment notwithstanding the verdict be reversed. Nonetheless, because I believe that the evidence was sufficient to support the jury's verdict as to TWA, I dissent from that portion of the court's judgment.

Given the broad deference we must afford findings made by a properly instructed jury, I cannot join in a judgment holding, as a matter of law, that the evidence was insufficient. The plaintiffs presented evidence that TWA made Fletcher a "Marketing Director," reporting directly to TWA's president and vested with broad authority to recruit, train and supervise agents soliciting life insurance for TWA. I cannot say that no reasonable juror could base a finding of implied or apparent authority on that agreement.

There was also evidence supporting a finding that TWA bound itself by ratifying Fletcher's conduct. Fletcher was asked on cross-examination whether, during the course of his association with TWA, he had ever informed TWA of the method of selling insurance upon which he relied. When Fletcher denied that he had, he was successfully impeached, and he admitted that he had in fact informed TWA of his scheme.[2] The jury was, I think, entitled to believe this testimony, and to discredit the contradictory statements made by TWA's witnesses, each of whom had an apparent bias.

Finally, the plaintiffs also presented evidence that TWA enjoyed an enormous boost in sales during Fletcher's tenure as a marketing director. Fletcher, who was associated with the company from late 1981 to late

2. The examination occurred as follows:

[BY PLAINTIFFS' COUNSEL]

Q: Mr. Fletcher, I'm showing you some interrogatory answers that you answered and signed before a notary public and swore that they were true. You see that?

A: Yes.

Q: Do you remember giving them?

A: Oh, yes.

Q: The question No. 28 is: "While you were an insurance agent for Trans World Assurance Company, did you ever disclose to Trans World Assurance personnel that you were selling insurance through tax seminars? If so, to whom did you tell this? State the gist of what you said." And your answer is: "Yes, to Charles Royals. I mentioned to him that a

tax lecture was being held and he might want to attend."

A: Uh-huh, yes. I believe your first question was when I first talked to them did I tell this to the president and my answer is no, this didn't come up till much later.

Q: But at some point while you were an agent Trans World you did inform Mr. Royals you were selling through this tax seminar approach?

A: If my memory serves me, I mentioned the tax seminars, we were having one and he should try to fit it in and he didn't and that was the extent of the matter.

*Davis v. Mutual Life Ins. Co. of N.Y.*, No. C–1–87–727 (S.D.Ohio Dec. 18, 1989), transcript of proceedings at 208.

1985, sold ordinary whole life insurance policies. Sales of this type of insurance skyrocketed during Fletcher's tenure at TWA.[3] Dramatic changes in income such as those apparently occasioned by Fletcher's association with the company were surely more than sufficient to put the company on notice that something was afoot. The incentive to look into Fletcher's General Managers' methods of salesmanship must have been especially strong since the changes wrought by those tactics impacted on the company in such a positive way. The jury was surely justified in believing that, under the circumstances, any reasonable person would have inquired into Fletcher's methods if for no other reason than to encourage their replication by other agents.

Charles Royals, the President of TWA, attempted to explain the rise and fall of the company's income with reference to factors unrelated to Fletcher's association. He claimed, for example, that the drop in income in the late 1980s was due, in part, to the company's decision to stop reinsuring a military benefit association's term life policies. Royals admitted that term life policies would not be included in the amount of whole life policies, which Fletcher was selling. Nonetheless, he explained, this fall in term life business would have indirectly affected the company's issuance of whole life policies because the two products were sold "in conjunction with" one another. Similarly unconvincing was Royals's attempt to explain the figures by reference to the company's sales of IRAs, which ceased in 1986, and which, Royals stated, were also sold as whole life insurance. Finally, Royals attempted to argue that the total face value of all policies issued by Fletcher and his organization—an amount that he conservatively estimated at $50 million—represented less than one per

cent of all sales. When plaintiffs' counsel demanded to know how the company's annual reports could be interpreted so as to yield a figure for total sales in the range of $5 billion, Royals simply stated, "You don't understand the insurance business." These protestations, and others like them, were often evasive and incomprehensible, and the jury was entitled to disbelieve them. The jurors would have been fully justified in concluding that Fletcher's success could not have gone unnoticed by TWA officials. Reviewing the evidence in the light we must, and cognizant that we may not substitute our judgment for that of the jury, I cannot join in a judgment holding that no reasonable juror could find that TWA authorized, was aware of, or affirmatively condoned Fletcher's unlawful activities.

## B. RICO

MONY asks this court to reverse the jury's finding that it is liable under section 1962(c) of RICO, which prohibits a person (real or corporate) from conducting or participating in the affairs of an enterprise through a pattern of racketeering activity. Specifically, RICO provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c).

The jury found that MONY, with Donald Fletcher, conducted or participated in the affairs of FIA or some other "association-in-fact" enterprise [4] through a pattern of racke-

---

3. The following data, extracted from the record, reflect the dramatic improvement in TWA's overall financial picture apparently occasioned by Fletcher's presence. Under each year is set forth the total face value of all new whole life and endowment policies and the premium income from all newly issued ordinary and industrial life policies, both in thousands.

| 1980 | 1981 | 1982 | 1983 | 1984 | 1985 | 1986 | 1987 | 1988 |
|------|------|------|------|------|------|------|------|------|
| 42,214 | 92,943 | 88,100 | 134,669 | 139,430 | 75,343 | 69,300 | 61,600 | 60,060 |
| 2,599 | 4,186 | 5,374 | 7,103 | 6,762 | 6,480 | 6,167 | 4,762 | 4,824 |

4. RICO defines "enterprise" to include: Any individual, partnership, corporation, association, or other legal entity and any union or group of individuals associated in fact although not a legal entity. 18 U.S.C. § 1961(4).

teering activity, consisting of mail and wire fraud associated with inducing the plaintiffs to participate in Fletcher's tax and insurance scheme. MONY challenges that verdict on two grounds.

#### 1. Distinctness

 MONY's first argument rests on the relatively uncontroversial premise that, for purposes of section 1962(c), a corporation cannot be both the "enterprise" and the "person" conducting or participating in the affairs of that enterprise. *See, e.g., Puckett v. Tennessee Eastman Co.,* 889 F.2d 1481, 1489 (6th Cir.1989); *Schofield v. First Commodity Corp. of Boston,* 793 F.2d 28, 29–30 (1st Cir.1986). Under the "non-identity" or "distinctness" requirement, a corporation may not be liable under section 1962(c) for participating in the affairs of an enterprise that consists only of its own subdivisions, agents, or members. An organization cannot join with its own members to undertake regular corporate activity and thereby become an enterprise distinct from itself. *United States v. Computer Sciences Corp.,* 689 F.2d 1181, 1190 (4th Cir.1982), *cert. denied,* 459 U.S. 1105, 103 S.Ct. 729, 74 L.Ed.2d 953 (1983). MONY argues that the jury verdict here violates this non-identity requirement because the verdict holds MONY liable for participating in the affairs of FIA, which, MONY maintains, is nothing but an association of MONY agents.

MONY's argument fails, however, because FIA need not be characterized merely as a division of MONY. We note at the outset that the district court explicitly instructed the jury that an individual or corporation cannot be both the "enterprise" and the "person" under RICO. At issue, therefore, is whether sufficient evidence supported the jury's finding that the enterprise was distinct from MONY. "In testing the sufficiency of the evidence, we may neither weigh the evidence, pass on the credibility of the witnesses nor substitute our judgment for that of the jury." *Marsh v. Arn,* 937 F.2d 1056, 1060 (6th Cir.1991) (quotations omitted). The record is replete with evidence from which the jury could reasonably conclude that FIA was a distinct entity: Fletcher's

organization and program were firmly established by 1980 when, after New York Life severed ties, Fletcher approached MONY with his offer to sell its insurance through his organization. Since 1977, a previous incarnation of FIA, the Fletcher–McKelvie Group, sold policies for New York Life Insurance Company using the same tax and insurance scheme. Moreover, while Fletcher and his employees operated as sales agents for MONY, FIA conducted its own seminars for recruiting clients and for training agents, and entered into its own contracts with tax preparation services. In addition, FIA had its own board of directors, its own business cards, and its own office stationery. Finally, FIA remained intact after Fletcher dissociated from MONY in November 1983. The continuity of FIA apart from the operations of the several insurance companies whose policies FIA sold is compelling evidence of its independent existence as an "enterprise." In short, as we said of the precursor to FIA, in reference to its sales for New York Life:

> [I]t *was clearly an independent organization* through which defendants sold life insurance policies to scores of clients across the country by enticing them with false claims that the clients could reduce or even eliminate their federal income tax liability.

*Hofstetter,* 905 F.2d at 903 (emphasis added). In *Hofstetter,* we held that the Fletcher–McKelvie Group, "given these circumstances, . . . constituted a *separate* RICO enterprise under any recognized definition of the statutory term." *Id.* While *Hofstetter* does not control here, since the instant case presents a new question, it nonetheless informs our inquiry to determine whether reasonable jurors could find that the enterprise was distinct from the corporate insurance company. *Hofstetter* speaks to the patent autonomy of the Fletcher–McKelvie Group, which later evolved with little alteration into FIA. Nothing in the facts before us, including Donald Fletcher's agreement to sell only MONY life insurance from June 1980 through November 1983, persuades us that the independence of FIA diminished to such an extent that the jury could reasonably conclude only that FIA was, during that interval, indistinguishable from MONY.

This analysis is unaffected by MONY's having acted through Fletcher. It might be argued that, since MONY's liability is predicated on acts of Fletcher, and since Fletcher could not have associated with FIA, MONY's liability must similarly be barred. This line of reasoning is flawed for two reasons. First, a RICO defendant's method of action is irrelevant. It matters not that MONY acted through an individual whose distinctness from the enterprise is open to question; what matters is that MONY itself and the enterprise are distinct. Second, and more important, even if the relevant inquiry were into the relationship between Fletcher and FIA, the finding of RICO liability could stand, for RICO contains no requirement that the person be removed from the enterprise. Although, as discussed above, RICO forbids the imposition of liability where the enterprise is nothing more than a subdivision or a part of the person, the requirement does not run the other way. Indeed, RICO requires that the person be employed by or associated with the enterprise. *Cf. McCullough v. Suter*, 757 F.2d 142 (7th Cir.1985) (holding that a sole proprietor, as the person, may associate with the business, as the enterprise, as long as there are other employees).

### 2. Vicarious Liability

In its second argument challenging liability under RICO, MONY asserts that, as a matter of law, a corporate principal may not be vicariously liable for its agents' actions in violation of section 1962(c). We review this question of law *de novo*. *U.S. v. Breitkreutz*, 977 F.2d 214, 221 (6th Cir.1992).

MONY overstates the law. This circuit *has not yet considered whether section 1962(c) of RICO rules out vicarious liability for corporate defendants*. Although courts of appeals in four other circuits have addressed the question, the doctrine remains muddied. To argue that *respondeat superior* does not apply here, MONY relies principally on *Schofield v. First Commodity Corp.*, 793 F.2d 28, 32–33 (1st Cir.1986), where the First Circuit refused to impute to a principal the RICO liability of its agents, reasoning that "the concept of vicarious liability is directly at odds with the Congressional intent behind section 1962(c)." Such broad language notwithstanding, the First Circuit's narrow description of the issue it decided in *Schofield*—namely, whether "a RICO 'enterprise' may ... be held liable for civil damages under section 1962(c) either directly or under principles of *respondeat superior*," *id.* at 29—suggests a far narrower holding. So, too, does the court's rationale, which is firmly rooted in the non-identity requirement discussed above:

> Both the language of [section 1962(c)] and the articulated primary motivation behind RICO show that *Congress intended to separate the enterprise from the criminal "person" or "persons."* Indeed, there is unlikely to be a situation, in the absence of an express statement, in which Congress more clearly indicates that *respondeat superior* is contrary to its intent.

*Id.* at 32 (emphasis added). In short, *Schofield* seems intertwined with the widely-embraced principle that a corporation may not be named as both a defendant "party" and as the RICO "enterprise." Its holding that *respondeat superior* does not apply to violations of section 1962(c) by corporate agents, therefore, seems restricted to cases, like *Schofield*, where the corporate defendant and the enterprise are indistinguishable.[5] Indeed, the First Circuit's only relevant gloss on *Schofield* cites that case for the proposition that "section 1962(c) does not recognize corporate liability *on the enterprise's part* under a theory of *respondeat superior*." *Miranda v. Ponce Federal Bank*, 948 F.2d 41, 45 (1st Cir.1991) (emphasis added). Thus,

---

**5.** The court's conclusion lends additional support to this interpretation:

> [A]ppellant's argument is that corporations at least should be liable when they participate in causing the wrongdoing that RICO punishes. We concede the appeal of this argument, and wholeheartedly agree that corporations should not escape liability when their policies foster

> the racketeering activity that is at the heart of RICO's prohibitions. But ... section 1962(c) poses a formidable barrier to holding the enterprise liable under that subsection. We think it inappropriate to use respondeat superior to accomplish indirectly what ... the statute directly denies.

793 F.2d at 33 (emphasis added).

we do not find *Schofield* particularly instructive in the instant case, where the corporate defendant charged with vicarious liability is *separate from* the RICO "enterprise."

Three other circuits have, like the First Circuit, refused to impose vicarious liability under section 1962(c) of RICO, but we find their decisions no more germane. In *Luthi v. Tonka Corp.*, 815 F.2d 1229, 1230 (8th Cir.1987), the Eighth Circuit refused, as a matter of law, to impute to the Tonka Corporation the alleged RICO violations of its chief financial officer. Citing *Schofield*, the court held that section 1962(c) does not permit vicarious liability, "particularly where the pleadings indicate that the principal was a victim of the individual's activities." *Id.* Here, the plaintiffs did not allege that Fletcher victimized MONY through his racketeering activity; instead, they alleged that MONY knowingly sponsored and *benefited* from the activity. *Luthi*, therefore, did not decide the question now before us.

Similarly, the Seventh Circuit, explicitly following both *Luthi* and *Schofield*, has also "reject[ed] the doctrine of *respondeat superior* in civil RICO cases." *D & S Auto Parts, Inc. v. Schwartz*, 838 F.2d 964, 968 (7th Cir), *cert. denied*, 486 U.S. 1061, 108 S.Ct. 2833, 100 L.Ed.2d 933 (1988). Like *Luthi* and *Schofield*, however, *D & S Auto Parts* is largely inapposite because it, too, involved a corporation indistinguishable from the alleged RICO enterprise that neither benefited from nor participated in the criminal scheme. *Id.* at 966–67. Indeed, the rationale of the court, which noted that "some participation in the criminal scheme [is] a necessary element of liability for the corporate-enterprise," and that an "employer may be vicariously liable only for employee action taken ... with intent to benefit the employer," *id.*, seems to permit liability in a case such as this one, where the corporate defendant was distinct from the enterprise and allegedly promoted the fraudulent scheme. *See also SK Hand Tool Corporation v. Dresser Industries, Inc.*, 852 F.2d 936, 941 (7th Cir. 1988), *cert. denied*, 492 U.S. 918, 109 S.Ct. 3241, 106 L.Ed.2d 589 (1989) (holding that corporate defendant, as an "unwilling conduit," could not be held vicariously liable for acts of individual defendants); *Liquid Air Corporation v. Rogers*, 834 F.2d 1297, 1306–07 (7th Cir.1987), *cert. denied*, 492 U.S. 917, 109 S.Ct. 3241, 106 L.Ed.2d 588 (1989) (holding that, where corporate defendant was victimized by acts of individual defendant, corporate defendant could not be vicariously liable if doing so would violate distinctness requirement).

Finally, the Ninth Circuit has recently reached the same conclusion. In *Brady v. Dairy Fresh Products Co.*, 974 F.2d 1149, 1154 (9th Cir.1992), the court stated, in a well-reasoned opinion, that vicarious liability would not be imposed upon a corporate defendant if doing so would violate the distinctness requirement, or if the company was not benefitted by the acts of the individual defendant. Since imposing vicarious liability on MONY would not violate the distinctness requirement, and since MONY benefitted by Fletcher's conduct, this holding does not change our analysis.

Our decision on this issue also finds support from the Third Circuit, which finds vicarious liability under section 1962(c) to be "appropriate" in cases like this one, where the corporate principal is distinct from the RICO enterprise and "is alleged to have attempted to benefit from its employees' racketeering activity." *Petro–Tech, Inc. v. Western Co. of North America*, 824 F.2d 1349, 1361–62 (3rd Cir.1987).

The rule to be drawn from these cases is that plaintiffs may not use RICO to impose liability vicariously on corporate "enterprises," because to do so would violate the distinctness requirement. No such prohibition, however, prevents the imposition of liability vicariously on corporate "persons" on account of the acts of their agents, particularly where the corporation benefitted by those acts. Such a prohibition, if it existed, would prevent corporate persons from ever being found liable under RICO, since corporate principals may act only through their agents. Such a rule would be manifestly contrary to the intent of Congress, and we decline to adopt it.

Here, the plaintiffs sought to impose liability on MONY as a corporate "person." They also presented abundant evidence that

MONY actively promoted and sponsored the scheme, and plainly benefitted from it through the resultant increase in its corporate income. Under these circumstances, we see no reason to disregard ordinary principles of *respondeat superior*. We therefore decline to invalidate the jury's finding that MONY was liable under section 1962(c) for its participation in Donald Fletcher's fraudulent scheme.

### 3. Control

█ Since oral argument in this case, the Supreme Court has spoken on a topic closely related to that of vicarious liability under RICO. In *Reves v. Ernst & Young*, —— U.S. ——, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993), an accounting firm failed to present in the condensed version of financial statements information suggesting that the audited business's primary asset might be grossly overvalued. The Court ruled that the accounting firm's involvement in the affairs of the business did not rise to the level at which RICO liability attached. The Court reasoned that, since RICO imposes liability only on those who "conduct or participate, directly or indirectly, in the conduct of [the] enterprise's affairs," the statute's reach extended only to persons who had "some part in directing those affairs." *Id.* at ——, 113 S.Ct. at 1170. Since the accounting firm's participation in the affairs of the business was tangential at best, the firm could not be held liable under RICO.

Although it is a close question, we believe that our analysis is unaffected by the Supreme Court's holding in *Reves*. The question is made difficult by virtue of MONY's participation in the affairs of FIA or some other association-in-fact having taken place largely through the acts of Fletcher. Nonetheless, we conclude that MONY exercised sufficient control over the affairs of the RICO enterprise to withstand scrutiny under the Supreme Court's new test.

First, there can be no question but that Fletcher himself exercised sufficient control over the affairs of the enterprise to meet the requirements of *Reves*. There is also little doubt that, under the circumstances of this case, Fletcher's acts can be attributed to MONY. Accordingly, we think it appropriate to attribute to MONY Fletcher's role within the RICO enterprise.

Additionally, we believe that MONY's participation in the affairs of FIA or some other association-in-fact was sufficiently extensive to meet the requirements of *Reves* even if we were to refuse to attribute to MONY Fletcher's control of the enterprise. As detailed below in section II(B)(2)(a), the evidence revealed that, even after MONY had received numerous warnings concerning FIA's fraudulent sales tactics, MONY continued to allow, if not actively encourage, Fletcher and his associates to carry on with their scheme. In light of this state of affairs, and of the central role that MONY's life insurance policies played in Fletcher's scheme, we have little difficulty in ruling that MONY exercised sufficient control over the affairs of the RICO enterprise to withstand scrutiny under *Reves*.

For the foregoing reasons, we affirm both the jury's verdict finding MONY liable under RICO and the district court's order denying MONY's motion for judgment notwithstanding that verdict.

### C. Attorneys' Fees.

Citing its authority under RICO and the Ohio CSPA, the district court awarded the plaintiffs $930,247 in attorney's fees. It arrived at that figure through a familiar two-step method. First, it calculated a "lodestar" figure of $531,569 by multiplying the number of hours reasonably expended on this litigation by a reasonable hourly rate. Second, because the plaintiffs hired their counsel on a contingency-fee basis and because this litigation had a great impact on the small practice of the plaintiffs' counsel, the district court then multiplied the $531,569 "lodestar" figure by 1.75 to arrive at the final award. On appeal, MONY argues (as does TWA) that the district court abused its discretion by enhancing the lodestar figure so dramatically.

Both RICO and the Ohio CSPA permit trial courts to award prevailing plaintiffs "a *reasonable* attorney's fee." 18 U.S.C. § 1964(c) (emphasis added); OHIO REV.CODE

§ 1345.09(F) (emphasis added). MONY argues that, by enhancing the lodestar figure by a factor of 1.75, the district court awarded fees not authorized under either statute because the award was *unreasonable*. We must decide, therefore, whether the enhanced award was "reasonable" under either RICO or the Ohio CSPA.

 Without distinguishing between the two fee-shifting statutes, the district court offered two justifications for using a multiplier to calculate a "reasonable" fee. First, it reasoned, enhancement was necessary to compensate for the contingency-fee arrangement between the plaintiffs and their counsel. Second, the court added, a multiplier was proper, given the large impact this litigation had upon the small practice of the plaintiffs' counsel.

### 1. MONY & TWA

#### (a) RICO

Though we cannot fault the district court, neither justification can support its use of a multiplier under RICO's fee-shifting provision. RICO permits a civil plaintiff to recover "the cost of the suit, including a reasonable attorney's fee." 18 U.S.C. § 1964(c). The district court cited and followed *Fite v. First Tennessee Production Credit Ass'n.*, 861 F.2d 884 (6th Cir.1988), in which our court relied on the same two justifications to affirm a fee award that enhanced the lodestar calculation by a multiplier of 1.75. *Id.* at 895 (holding that a "contingent fee arrangement justifies the use of a multiplier," and that "the fact that counsel worked in a two-person firm is relevant").

Recent Supreme Court authority, however, requires that we disavow our holding in *Fite*, and reverse the district court's use of a multiplier insofar as it rests on RICO's fee-shifting provision. In *City of Burlington v. Dague*, —— U.S. ——, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992), the Court clarified its interpretation of the numerous federal fee-shifting statutes that authorize courts to award "reasonable" attorney fees to a pre-

vailing party. Correcting a misunderstanding held by our court and many others in the wake of *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 483 U.S. 711, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987), the Supreme Court ruled "that enhancement for contingency is not permitted under the [typical federal] fee-shifting statutes." —— U.S. at ——, 112 S.Ct. at 2643.

Under that straightforward holding, section 1964(c) of RICO, which does not materially differ from the fee-shifting provision at issue in *City of Burlington* (section 7002(e) of the Solid Waste Disposal Act),[6] plainly does not permit a court to enhance an attorney's fees on account of contingency. *Cf. Wolfel v. Morris*, 972 F.2d 712, 720 (6th Cir.1992) (reversing, on basis of *City of Burlington*, fee enhancement awarded under 42 U.S.C. § 1988); *Drennan v. General Motors Corp.*, 977 F.2d 246, 253 (6th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 2416, —— L.Ed.2d —— (1993) (extending *City of Burlington* to enhancement of fees awarded under ERISA, 29 U.S.C. § 1132(g)(1)).

*City of Burlington* similarly leads us to reject the enhancement of attorneys' fees on the grounds that the litigation in question impinges significantly on a small law practice. The Court noted that enhancement for contingency was inappropriate because it "would likely duplicate in substantial part factors already subsumed in the lodestar." —— U.S. at ——, 112 S.Ct. at 2641. The Court based this conclusion on the observation that the risk posed by contingent fee arrangements is largely a function of the merits of a claim and the difficulty of establishing those merits, and on the observation that the second factor will generally be reflected in the lodestar, "either in the higher number of hours expended to overcome the difficulty, or in the higher hourly rate of the attorney skilled and experienced enough to do so." *Id.*

This same reasoning applies to enhancement based on the disproportionate effect that a piece of litigation has on a small law practice. The portion of a firm's work attrib-

---

**6.** Indeed, the Court noted that the "language is similar to that of many other federal fee-shifting statutes," and that its "case law construing what is a 'reasonable' fee applies uniformly to all of them." —— U.S. at ——, 112 S.Ct. at 2641.

utable to a single piece of litigation can be relevant only insofar as there exists a negative correlation between that figure and the firm's ability to take on additional clients. Since attention detracted from other matters is devoted to the matter at hand, this factor is already reflected in the lodestar in the number of hours expended.[7]

A further consideration suggests that the holding in *City of Burlington* may properly be extended to prohibit enhancement on grounds other than contingency. The Court noted that "the interest in ready administrability ... and the related interest in avoiding burdensome satellite litigation ... counsel strongly against adoption of contingency enhancement." *Id.* at ——, 113 S.Ct. at 2643. So, too, do they counsel against enhancement based on many other factors. Ohio courts, for example, may currently select from a dizzying array of justifications for enhancement of a lodestar.[8] One may readily envision a scenario wherein, through a tortuous process of litigation, each of these factors is eventually brought under the rule of *City of Burlington*. In light of the Supreme Court's announcement that one of the desired attributes of the federal fee-shifting statutes is "ready administrability," we consider it appropriate to extend the rule of *City of Burlington* so as to prevent enhancement of lodestars on grounds of disproportionate effect.[9]

Accordingly, we hold that, insofar as *Fite* is inconsistent with *City of Burlington*, it no longer represents the law of this Circuit. Under RICO, a contingent fee arrangement does not justify the use of a multiplier, and it is irrelevant that prevailing counsel worked in a small firm. Insofar as the district court relied on RICO to issue its fee award, it abused its discretion.

### (b) *CSPA*

■ That does not end our inquiry. The district court did not rely solely on RICO; it ordered MONY and TWA to pay attorneys' fees pursuant to Ohio's CSPA, which permits the court to "award to the prevailing party a reasonable attorney's fee limited to the work reasonably performed...." OHIO REV.CODE ANN. § 1345.09(F)(2). The United States Supreme Court's interpretation of federal fee-shifting statutes, of course, does not control our interpretation of that state statute. We must determine, therefore, whether the court's use of a 1.75 multiplier would, as MONY urges, be *unreasonable* under Ohio's construction of the CSPA.

We review the district court's interpretation of the CSPA fee-shifting provision *de novo*. *Salve Regina College v. Russell*, 499 U.S. 225, 231–32, 111 S.Ct. 1217, 1221, 113 L.Ed.2d 190 (1991). Under Ohio law, trial courts enjoy broad discretion in calculating the amount that is "reasonable" under sec-

---

7. It could be argued that enhancement based on impact is appropriate because the maintenance of comparatively large pieces of litigation prevents small firms from diversifying risk by taking on additional clients. This risk, however, is present only where fees are contingent, and so *City of Burlington* clearly prohibits enhancement based on such a consideration.

8. Ohio courts may select a multiplier figure based on any consideration listed in the Model Code of Professional Responsibility as a basis for computing a reasonable fee. *Bittner v. Tri-County Toyota, Inc.*, 58 Ohio St.3d 143, 569 N.E.2d 464, 467 (1991). As set forth in the Ohio Rules, these factors are:

(1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly.

(2) The likelihood, if apparent to the client, that the acceptance of the particular employ-

ment will preclude other employment by the lawyer.

(3) The fee customarily charged in the locality for similar legal services.

(4) The amount involved and the results obtained.

(5) The time limitations imposed by the client or by the circumstances.

(6) The nature and length of the professional relationship with the client.

(7) The experience, reputation, and ability of the lawyer or lawyers performing the services.

(8) Whether the fee is fixed or contingent. DR 2–106.

9. We note also that at least four Justices of the Supreme Court have concluded that, as a general rule, courts should not enhance lodestars by more than one third. *Pennsylvania v. Delaware Valley Citizen's Council for Clean Air*, 483 U.S. 711, 730, 107 S.Ct. 3078, 3089, 97 L.Ed.2d 585 (1987) (plurality opinion of White, J.).

tion 1345.09(F)(2), though the Supreme Court of Ohio has announced guidelines:

> When awarding reasonable attorneys' fees pursuant to R.C. 1345.09(F)(2), the trial court should first calculate the number of hours reasonably expended on the case times an hourly fee, and then may modify that calculation by application of the factors listed in DR 2-106(B).... All factors may not be applicable in all cases and the trial court has the discretion to determine which factors to apply, and in what manner that application will affect the initial calculation.

*Bittner v. Tri–County Toyota, Inc.*, 58 Ohio St.3d 143, 569 N.E.2d 464, 467 (1991). Unlike the generic federal fee-shifting statutes, section 1345.09(F)(2) permits a trial court to award fees based on the familiar "lodestar" figure *with an enhancement where payment is contingent on outcome and where the case precludes the attorney from accepting other cases. See n. 8, supra.*

Concededly, the Ohio Supreme Court's 1991 interpretation of the term "reasonable attorneys' fee" in *Bittner* faithfully follows the United States Supreme Court's then extant interpretation of the term. *See, e.g.*, 569 N.E.2d at 466 (citing *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983)). Accordingly, one might infer from the Ohio court's reliance on current federal law a general policy of following federal law on this issue. *See Hall v. Lacheta*, No. 92AP020013, slip op. at 6, 1992 WL 362546, 1992 Ohio App. lexis 5945 (Nov. 19, 1992). Were we to do so, we could conclude that, were the supreme court of Ohio to revisit this issue, it would once again follow federal law and disallow enhancement of the type considered here.

■ We decline, however, to make such an inference. It is hornbook law that a federal court sitting in diversity must apply state law "in accordance with the then controlling decision of the highest state court." *Vandenbark v. Owens–Illinois Glass Co.*, 311 U.S. 538, 543, 61 S.Ct. 347, 350, 85 L.Ed. 327 (1941); *Monette v. AM–7–7 Baking Co.*, 929 F.2d 276, 280 (6th Cir.1991). This rule applies unless the federal court is convinced by "persuasive data that the highest court of the

state would decide otherwise." *New Hampshire Ins. Co. v. Vieira*, 930 F.2d 696, 701 (9th Cir.1991) (quoting *West v. American Tel. & Tel. Co.*, 311 U.S. 223, 237, 61 S.Ct. 179, 183, 85 L.Ed. 139 (1940)). We cannot allow a propensity to speculate as to yet unarticulated law to allow us to indulge our own predisposition.

Here, the Ohio Supreme Court did not make sufficiently clear its intent consistently to pattern its decisions on this issue after those of the federal courts to persuade us to overturn its most recent decision on the issue. *Cf. In re Ryan*, 851 F.2d 502 (1st Cir.1988) (holding that lower court erred in predicting that state court would reverse controlling decision, unrevisited since 1869); *Awrey v. Progressive Cas. Ins. Co.*, 728 F.2d 352 (6th Cir.1984), *cert. denied*, 474 U.S. 920, 106 S.Ct. 250, 88 L.Ed.2d 258 (1985) (holding that lower court did not err in refusing to attempt to predict course of state court decisions). And, there is no suggestion in recent opinions of the Ohio courts of appeals awarding fees under the CSPA that *Bittner* is no longer good law. *See, e.g., Wolfe v. Cooper*, No. 62372, slip op. at 12, 1993 WL 180199, 1993 Ohio App. lexis 2611 (May 27, 1993). Accordingly, while we prefer the federal rule, and can rationally speculate that Ohio's supreme court may reexamine Ohio fee-shifting provisions in the wake of *City of Burlington*, such speculation provides a wholly inadequate basis for disregarding such a clear pronouncement by the state's highest court. While the enhanced award is impermissible under RICO, and startlingly high, it is not "so high ... as to shock the conscience." Accordingly, *Bittner* commands that we not interfere. 569 N.E.2d at 467.

### 2. *Davis*

■ In his cross-appeal, plaintiff Emmett R. Davis also appeals the fee award. Davis argues that the district court erred by failing to adopt the jury's recommendation that it award the plaintiffs $129,510 in attorney's fees. The recommendation, Davis argues, required the court to add that sum to its $930,247 award. As *Bittner* makes clear, however, the court itself determines the award. The district court's broad discretion

certainly encompasses the discretion to disregard the jury's recommended award.

For the foregoing reasons, we hold that the district court's award of attorney's fees was "unreasonable" under RICO, but "reasonable" under the CSPA. Accordingly, the court affirms as to MONY the district court's Order Awarding Attorney's Fees. Parenthetically, and in dissent, since I would affirm the district court's rulings holding TWA liable, I would affirm the award of fees against TWA as well.

## D. Evidentiary Issues

TWA appeals two evidentiary rulings made by the district court. Because it is the judgment of a majority of this court that the district court's denial of TWA's motion for judgment notwithstanding the verdict be reversed, the court need not address TWA's remaining claims of error. Because I would affirm as to TWA, however, I will address TWA's arguments.

### 1. Fifth Amendment Privilege

TWA's first objection centers on appearances made by two non-party witnesses who had indicated before trial that, if compelled to appear, they would refuse to answer any questions regarding Donald Fletcher's tax and insurance program. The two witnesses, Fletcher's former employees Sandra Goldstick and Evelyn Johnson, announced before trial that they intended to invoke their Fifth Amendment privilege against self-incrimination. TWA and MONY, fearful that the jury would construe repeated invocations of the privilege as admissions of guilt, which the jury would impute to them, moved the district court to bar Goldstick's and Johnson's testimony. Citing Federal Rule of Evidence 403,[10] the insurance companies argued that exclusion was appropriate because the minimal probative value of such testimony could not counterbalance its highly prejudicial, confusing, and misleading effect. The district court denied the motions, and, at trial, each witness indeed repeatedly invoked her privi-

lege. TWA appeals the district court's order denying its motion *in limine.*

A district court's decision that the probative value of a particular witness's appearance outweighs its prejudicial effect is, of course, a matter of discretion, and we may reverse only if that discretion is abused. *U.S. v. Kelley,* 849 F.2d 999, 1003 (6th Cir.), *cert. denied,* 488 U.S. 982, 109 S.Ct. 532, 102 L.Ed.2d 564 (1988). Moreover, we must examine the witness's testimony in a light most favorable to its proponent, maximizing its probative value and minimizing its prejudicial effect. *Id.* Reviewing Goldstick's and Johnson's testimony in that light, I find a permissible exercise of discretion.

"In order to exclude evidence under Rule 403, the evidence must be more than damaging; it must be unfairly prejudicial." *U.S. v. Rey,* 923 F.2d 1217, 1222 (6th Cir.1991). Unfair prejudice, moreover, "means an undue tendency to suggest a decision on an improper basis." *Id.* TWA argues that any inference that the jury could draw from Johnson's and Goldstick's invocations of the privilege would constitute just such an improper basis. Thus, they argue, the evidence had no probative value whatsoever and a strong tendency to suggest a decision on an improper basis. I disagree.

In a civil case, a party's invocation of the privilege against compulsory self-incrimination gives rise to a legitimate inference that the witness was engaged in criminal activity. *Baxter v. Palmigiano,* 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976); J.H. WIGMORE, 8 EVIDENCE IN TRIALS AT COMMON LAW § 2272, at 439 (McNaughten rev. 1961 & Supp.1991); *See also Rosebud Sioux Tribe v. A & P Steel, Inc.,* 733 F.2d 509, 522 (8th Cir.) *cert. denied,* 469 U.S. 1072, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984). As Justice Brandeis observed, "[s]ilence is often evidence of the most persuasive character." *United States ex rel. Bilokumsky v. Tod,* 263 U.S. 149, 153–54, 44 S.Ct. 54, 56, 68 L.Ed. 221 (1923). I see no reason to distinguish a party's invocation of the privilege from that of a non-party witness, since

---

10. Rule 403 provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. Fed.R.Evid. 403.

the inference to be drawn in either case runs against the defendant. Moreover, our court, in appropriate circumstances, has "permitted the practice of calling a witness who will assert his fifth amendment privilege" in a *criminal* trial. *U.S. v. Vandetti*, 623 F.2d 1144, 1145 (6th Cir.1980). In criminal proceedings, of course, the aims that underlie the privilege apply with more force than they do in civil proceedings. Thus, our holding in *Vandetti* applies with greater force here.

In this case, Johnson's refusal to answer questions had great probative value. There was a great deal of evidence that she was a central figure in Fletcher's organization. She had worked for Fletcher since the 1970s. She not only actually sold life insurance to each plaintiff on Fletcher's behalf, but she was also the individual who referred the plaintiffs to Fletcher's tax preparation services. Although Goldstick was more peripherally involved in Fletcher's operation, she was another employee repeatedly mentioned during the trial. The refusal of these two witnesses to answer any questions about actions they had taken on behalf of FIA support a rational inference that they had participated in activity that they feared would subject them to criminal liability. *See Cerro Gordo Charity v. Fireman's Fund American Life Ins. Co.*, 819 F.2d 1471, 1480–82 (8th Cir. 1987).

Furthermore, where the witness invoking the privilege is a former employee of the civil defendant, and where the questions that the witness refuses to answer concern the witness's activities undertaken on behalf of the employer and during the period of employment, it is proper to allow the jury to impute the witness's guilt to the defendant. *Cerro Gordo Charity*, 819 F.2d at 1481; *RAD Services, Inc. v. Aetna Casualty and Surety Co.*, 808 F.2d 271 (3rd Cir.1986); *Brink's, Inc. v. City of New York*, 717 F.2d 700 (2d Cir.1983). This is particularly true where, as here, other evidence implicates the defendant in the activities of the witness claiming the privilege. *RAD Services*, 808 F.2d at 277. Thus, both the inference and the imputation of guilt were proper.

For the foregoing reasons, I would hold that the district court's denial of TWA's and MONY's motion to exclude the testimony of Sandra Goldstick and Evelyn Johnson was not an abuse of discretion.

### 2. *Hearsay*

TWA raises a second evidentiary claim. It argues that the district court erred when it prohibited TWA's president, Charles Royals, from testifying about a conversation that he had with Evelyn Johnson. At trial, TWA made no proffer regarding the content of this proposed hearsay testimony. A week after the district court entered its judgment, however, Royals stated in an affidavit that, two months before the trial, Johnson, upset and crying, called him to discuss this litigation, and said that she feared losing her home, which was subject to a judgment lien resulting from an earlier lawsuit involving the same tax and insurance scheme. Johnson purportedly informed Royals that the plaintiffs' counsel, who was also counsel for the plaintiffs in the earlier case, had threatened to execute the lien unless she paid him $10,-000 and testified on the plaintiffs' behalf in this case. TWA argues that Johnson's hearsay statements were admissible under Rule of Evidence 803(3), which permits hearsay statements regarding a declarant's then existing emotion or state of mind. This claim merits little comment. Even if plaintiffs' counsel's statements to Johnson fall outside the hearsay rule because they were offered to show that a threat had been made, and even if Johnson's statements to Royals fall within the exception for statements regarding state of mind because Johnson purportedly stated that she was fearful, the district court was nonetheless entitled to exclude the statements under Rule 403. Again, Rule 403 permits the court to exclude relevant evidence when its prejudicial effect substantially outweighs its probative value. Clearly, these volatile hearsay statements, charging that the plaintiffs' counsel extorted a witness, were manifestly prejudicial. Furthermore, because they were not relevant to any issue in the case, their probative value was nil.[11]

---

11. TWA argued below that the testimony was offered to establish Johnson's distraught state of

mind when she took the stand. Since, however, Johnson testified to little other than her name,

The district court was well within its discretion to exclude the statements.

### E. Apportionment of Damages.

Neither side is satisfied with the manner in which the district court apportioned damages. The court adjudged all four defendants jointly and severally liable for all damages resulting from their breaches of fiduciary duty, but apportioned liability among the defendants for all other damages and attorneys' fees. In the principal appeal, TWA contends that the district court erred by imposing joint liability for the breach of fiduciary duty damages. In the cross-appeal, Davis counters that the court erred by failing to hold all defendants jointly and severally liable for all damages and fees.

#### 1. TWA

Because it is the judgment of a majority of this court that TWA be absolved of all liability, the court need not address TWA's argument that the district court erred in holding it jointly liable for the damages stemming from the defendants' breaches of fiduciary duty. Because I would affirm as to TWA, however, I address that claim of error.

The decision whether to hold two defendants jointly liable turns on the independence of the defendants and on the injuries they caused. Under Ohio law, a judgment against an independent tortfeasor "can extend only to the injuries proximately caused by that tortfeasor." *Jones v. Meinking*, 40 Ohio App.3d 45, 531 N.E.2d 728, 730 (1987). In other words, "a joint judgment against two or more tortfeasors is proper only where, because of their relationship, concert of action, or independent but concurrent action, each is vicariously responsible for the wrongful acts of the other or others to the extent of the entire damage done." *Farmers State Bank & Trust Co. v. Mikesell*, 51 Ohio App.3d 69, 554 N.E.2d 900, 914 (1988) (quotation omitted).

Here, the two defendant insurance companies did not interact with one another. Fletcher sold life insurance for MONY between 1980 and 1983, and did not begin to sell TWA policies until after he dissociated from MONY in November 1983. Hence there is no relationship, concert of action, or even concurrent action to support a theory of vicarious responsibility between MONY and TWA. Moreover, there is no real overlap between the injuries attributable to MONY and those attributable to TWA. Apart from injuries resulting from the breaches of fiduciary duties, the plaintiffs' injuries consist simply of their federal tax liabilities and penalties, as assessed by the IRS. These injuries are readily divisible according to the sale of a specific carrier's insurance. Hence, TWA did not proximately cause and is not otherwise responsible for the distinct injuries that Fletcher caused while selling policies for MONY. Accordingly, I would hold that the district court erred in holding TWA jointly liable to MONY policyholders for damages arising out of the defendants' breaches of fiduciary duty.

The same reasoning would seem to apply to the district court's decision to hold MONY liable to TWA policyholders. MONY has failed, however, to raise such an argument. Nevertheless, to avoid confusion on remand, I am authorized to state that the entire panel of the court agrees that MONY may not be held liable to TWA policyholders.

#### 2. Davis

Davis objects to the district court's refusal to hold all defendants jointly liable for all damages. Specifically, Davis argues that, under Ohio law, the district court erred in apportioning between TWA and MONY damages arising out of the defendants' fraud, breaches of contract, and violations of the Ohio CSPA. Additionally, Davis argues that, under federal law, the district court erred in refusing to hold MONY jointly liable to TWA policyholders for damages arising out of Fletcher's violations of RICO. Davis's claims regarding apportionment may thus be divided into two types: (a) claims that TWA should be liable to MONY policyholders for violations of state law; and (b) claims that

---

her credibility was not at issue, and her state of mind was therefore irrelevant. It is more likely that TWA offered the testimony in order to establish that plaintiffs' counsel had violated the rules of professional conduct. Such an allegation, however, has no place in a civil trial.

MONY should be liable to TWA policyholders for violations of state and federal law.

## (a) *TWA*

In light of the majority's decision to absolve TWA of all liability, the court need not address Davis's argument that TWA should be jointly liable to MONY policyholders for the defendants' violations of state law. Because I would affirm as to TWA, however, I address Davis's claims in this regard.

Davis's claims may be disposed of simply by reference to my discussion of TWA's argument in section II(E)(1), *supra*. The injuries suffered by MONY policyholders and those suffered by TWA policyholders are completely separate, and state law prohibits the imposition of joint liability in such circumstances. Thus, I would hold that the district court did not err in refusing to hold TWA jointly liable for the injuries to MONY policyholders.

## (b) *MONY*

■ Davis's argument that MONY should be held jointly liable to TWA policyholders is as easily dismissed. As noted above, *see* n. 1, *supra*, Davis is the only plaintiff before this court on appeal. Davis was a MONY policyholder, and never had any contact, direct or indirect, with TWA. Thus, Davis has no standing to raise claims on behalf of TWA policyholders. Accordingly, we do not address this claim of error.

## F. Attorney Misconduct

■ In his cross-appeal, Emmett R. Davis appeals the district court's order denying plaintiffs' motion for a new trial retrying only the issue of punitive damages. Misconduct on the part of TWA's and MONY's trial counsel, Davis maintains, created unfair prejudice and passion against the plaintiffs and their counsel on the issue of punitive damages. Specifically, Davis points to potentially prejudicial remarks, made during closing arguments by counsel for MONY and TWA, accusing plaintiffs' counsel of gross ethical violations and subornation of perjury. The district court denied the motion because, given the jury's generous damage award, it could not conclude that there was a reason-

able probability that any attorney misconduct unduly influenced the jury's verdict. Accordingly, the court concluded, no new trial was warranted. For largely the same reasons, we affirm.

■ We afford considerable deference to a district court's determination whether attorney misconduct warrants a new trial. "[T]he determination of the extent of permissible comment and argument by counsel rests primarily in the judicial discretion of the lower court." *City of Cleveland v. Peter Kiewit Sons' Co.*, 624 F.2d 749, 756 (6th Cir.1980); *Twachtman v. Connelly*, 106 F.2d 501, 509 (6th Cir.1939). Nonetheless, where there is a reasonable probability that a counsel's improper comment on extraneous matters unduly influences a jury verdict, the verdict should be set aside. *City of Cleveland*, 624 F.2d at 756. To determine whether such a probability exists, we examine the totality of the circumstances, including the verdict itself. *Id.*

In the instant case, the plaintiffs enjoyed a highly favorable verdict; the jury awarded the 29 plaintiffs $1,054,075 in compensatory damages and recommended another $338,039 in punitive damages. In light of these awards, we are unable to see sufficient indication that attorney misconduct resulted in prejudice against the plaintiffs. Like the district court, we find it unlikely that inappropriate comment would adversely affect the plaintiffs with respect to the punitive damage award but not the remainder of the judgment, in which they fared extraordinarily well. We hold therefore that the district court did not abuse its broad discretion to determine whether attorney misconduct requires a retrial, and affirm its order denying the plaintiffs' motion for a new trial on punitive damages.

## III.

For the foregoing reasons, and for the reasons separately expressed by Judge Kennedy and concurred in by Judge Guy, we AFFIRM the district court's denial of MONY's motions for judgment notwithstanding the verdict and for a new trial, but we REVERSE the district court's denial of

TWA's motion for judgment notwithstanding the verdict. We AFFIRM the district court's order awarding attorney's fees against MONY, but VACATE that order as it relates to TWA. We AFFIRM the district court's order denying plaintiffs' motion for a new trial on the issue of punitive damages, and we VACATE the district court's order apportioning damages. We REMAND for entry of judgment in favor of TWA and for reapportionment of damages and attorney fees against MONY consistent with this opinion.

CORNELIA G. KENNEDY, Circuit Judge, with whom Judge RALPH B. GUY joins, concurring in part and dissenting in part.

We concur in all of Judge Engel's opinion except for parts II(A)(2)(b) and II(D), the portions upholding the verdict against TWA.

 Fletcher was a general agent of TWA to sell life insurance. As such, he was an independent contractor. He was "free to exercise independent judgments as to the time and manner in which he [would] perform the services." General Agent's Contract. He was to solicit and produce applications for life insurance and annuities. The contract expressly provided that he could not alter or waive any terms of the policies he sold or make representations not strictly in accordance with policies. He was not "[t]o incur any expense or obligation of any kind or nature in the name of or on behalf of the Company, without first obtaining the express written authority of the Company in each case, ..." or "[t]o do or perform any act or thing other than is expressly granted herein." Each policy of insurance was sold on the basis of an application for insurance sent to TWA and accepted by it. The policy clearly said that the contract with TWA was contained in the policy and the application, and that they were the entire contract and could only be modified in writing signed by an officer of the company. Thus, the insureds were on notice that Fletcher's authority was limited.

There is no evidence that TWA ever authorized any of its agents to become involved in income tax preparation.

The marketing director agreement merely gave Fletcher an override on sales by agents he brought along with him to TWA. It did not purport to make him an employee of TWA but maintained the independent contractor relationship. Both Fletcher and the agents, from whom he received an override, also wrote insurance for other insurance companies during the time they wrote for TWA.

 Judge Engel acknowledges that the evidence against TWA is slight. He infers, however, that the jury could infer that TWA knew of Fletcher and his sub-agents' fraudulent tax scheme. Fletcher denied ever telling TWA of his scheme. Judge Engel states that the testimony of Fletcher, quoted on page 12 of his opinion, is sufficient for the jury to find that Fletcher was impeached when he said that he did not inform TWA of his scheme. I disagree. The fact that Fletcher, in a conversation, told a TWA executive that a tax lecture was being held and he might like to attend gave no notice to TWA of the tax scheme here. The executive did not attend and the subject was not discussed again. Judge Engel also would find knowledge from the large increases in sales. The increases might have been sufficient to cause TWA to inquire how these insurance agents did so well. But there is no evidence that it did inquire and direct evidence that it did not. If we were dealing with a negligence standard, I could agree that further inquiry might be required. But the standard here is what TWA knew, not what it should have investigated. The evidence was insufficient to permit the jury to find ratification under the court's instruction.

The jury instruction on ratification stated:

The insurance companies may be bound by the acts of their agents, Donald Fletcher, Evelyn Johnson and others, even if such acts exceeded their actual or apparent authority, if the insurance companies ratified such actions. A principal may ratify the actions of his agent by receiving and retaining the benefits of the transaction, or by mere silence where his silence tends to mislead, when done with full knowledge of all material facts.

The ratification by the principal of an unauthorized action may be shown by the conduct of the principal done with full knowledge of all material facts.

There was no basis for the jury to find that TWA had ratified Fletcher's tax fraud with full knowledge of all material facts.

Because we find the evidence insufficient with respect to TWA, we set aside the verdict and dismiss the action against TWA.