**Myra L. HOFSTETTER,**
**Plaintiff–Appellee,**

v.

**Donald S. FLETCHER, The Fletcher–McKelvie Group, Fletcher Insurance Association, and Evelyn Johnson, Defendants–Appellants,**

and

**Neil McKelvie, Neil Christal, Sr., Neil Christal, Jr., and The New York Life Insurance Company, Defendants.**

No. 87–3502.

United States Court of Appeals,
Sixth Circuit.

Argued Aug. 19, 1988.

Decided Oct. 14, 1988.

898

Barbara M. Brown (argued), Cincinnati, Ohio, for defendants-appellants.

Michael G. Florez, William H. Blessing (argued), Cincinnati, Ohio, for plaintiff-appellee.

Before MARTIN, GUY and NORRIS, Circuit Judges.

RALPH B. GUY, Jr., Circuit Judge.

The defendants, Donald S. Fletcher, Evelyn Johnson, and the Fletcher–McKelvie Group, appeal from the jury's verdict in favor of plaintiff, Myra L. Hofstetter, finding defendants liable for common law

fraud, breach of fiduciary duty, breach of contract, and for violating the Ohio Consumer Sales Practices Act, Ohio Rev.Code Ann. § 1345.01, *et seq.* Fletcher and Johnson also appeal from the portion of the jury's verdict imposing liability under the federal Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961, *et seq.* For the following reasons, the award of damages is affirmed.

## I.

The various claims against defendants were essentially based on their use of a fraudulent sales tactic to sell life insurance policies to investors such as plaintiff, Myra Hofstetter. Fletcher, a San Francisco based agent for New York Life Insurance Company, travelled throughout the country selling life insurance policies by emphasizing favorable tax advantages. According to Fletcher, potential investors could drastically reduce and even eliminate their federal income tax liability by purchasing a life insurance policy in conjunction with the formation of a home-based business. Fletcher informed the investors that they could write off almost all of their household expenses and attribute them to deductible business expenses. Fletcher also promised to assist the investors in the filing of their annual income tax forms. In order to participate in this tax/insurance program, the investor was required to purchase life insurance policies from Fletcher by paying annual premiums equal to one-half of the client's income tax for the previous year. The client was also required to become involved in a home-based business and to invest the equivalent of the other half of the preceding year's tax payment in the home-based business. In order to obtain sufficient capital, many of the clients submitted new IRS W–4 forms, prepared by Fletcher, claiming enough exemptions to lower their federal tax withholding on their paychecks to zero. The previously withheld money was then used to fund the required insurance via the life insurance company's automatic monthly withdrawals from the clients' checking accounts. The money was also available for investments in the home-based business.

Fletcher's sales promotion scheme proved very successful and within a year he had dramatically increased his sales from $159,000 in 1975 to more than $1.3 million in 1977. By 1978, Fletcher's annual sales exceeded $4 million and he joined with another agent, Neil McKelvie, to form the Fletcher–McKelvie Group. Fletcher subsequently recruited other agents, including defendant Evelyn Johnson, to join the Fletcher–McKelvie Group and to help conduct his tax/insurance seminars. Fletcher conducted these seminars throughout the United States. Between 1977 and 1980, the Fletcher Group sold more than $36 million in New York Life Insurance policies.

In June 1977, plaintiff, Myra Hofstetter, attended one of Fletcher's seminars in Harrison, Ohio. Hofstetter was a widow of limited means who was employed as a telephone cable splicer for Cincinnati Bell. During the presentation, Fletcher assured the audience that he could legally reduce their federal income tax liability to zero. Fletcher also made frequent references to patriotism, capitalism, and religion. Following the seminar, Evelyn Johnson visited plaintiff at her home and convinced her to participate in the tax/insurance program. Johnson prepared a new W–4 form for Hofstetter, declaring 25 exemptions in order to eliminate any federal income tax withholding from her paycheck. While at Hofstetter's home, Johnson calculated the amount of life insurance that Hofstetter would have to buy ($2,500 in premiums per year—one policy on Hofstetter's life and one on the life of her roommate, Patty Brinker). Johnson also prepared applications for the required policies and took Hofstetter's check for $226 reflecting the initial insurance premium payment. Johnson further arranged for automatic monthly payments to be drawn from Hofstetter's checking accounts and sent directly to New York Life Insurance Company. Cincinnati Bell initially refused to process plaintiff's W–4; however, it eventually relented after receiving a threatening letter from Fletcher's attorney written on behalf of plaintiff.

On June 18, 1980, New York Life Insurance Company notified Hofstetter that Fletcher, Johnson, and McKelvie were no longer associated with the New York Life Insurance Company and that the company did not endorse or authorize any tax program of the Fletcher–McKelvie Group. In March 1981, plaintiff received a full refund for the premium she paid to the New York Life Insurance Company. Nevertheless, plaintiff continued to rely on Fletcher to assist her in preparing her annual income tax returns. In 1981, Hofstetter was informed that the Internal Revenue Service (IRS) was auditing her 1979 and 1980 tax returns which Fletcher had prepared. Following Fletcher's instructions, she telephoned him when she received notice of the audit. Fletcher dictated some letters to Hofstetter which she then mailed to the IRS. Shortly thereafter, Fletcher assumed complete responsibility for representing plaintiff before the IRS. Hofstetter later received notice that her returns for the years 1981–83 would be audited. Hofstetter again relied on Fletcher to handle the audit and he continued to assure her that "everything was going as planned" and that the IRS would drop the audits. Hofstetter apparently refused to cooperate with the IRS in its investigation and instead referred all inquiries to Fletcher.

In January of 1985, the IRS issued a notice of levy, garnished Hofstetter's savings and checking accounts, and imposed a statutory lien on her home. By the time of trial, tax assessments, penalties, and interest had reached approximately $70,000, in addition to more than $9,000 in payments which Hofstetter had already made to the IRS before the trial. Hofstetter was unable to meet her various financial obligations following the actions taken by the IRS. She filed suit against the defendants on October 2, 1985. In her suit, Hofstetter alleged that she had been promised zero tax liability and that she had been damaged by the fact that she was now being assessed additional taxes along with the penalties and interest. Three of the defendants, including New York Life Insurance Company, settled with plaintiff prior to termination of the trial. Judge Rubin entered a directed verdict for defendants on plaintiff's claims under the Securities Exchange Act of 1934. The jury found defendants Fletcher and Johnson liable under the Racketeer Influenced and Corrupt Organizations Act, and Fletcher, Johnson, and the Fletcher–McKelvie Group liable under the Ohio Consumer Sales Practices Act, and common law theories of fraud, breach of contract, and breach of fiduciary duty. Judge Rubin subsequently issued several orders of remittitur altering the amount of damages to a final total of approximately $300,000. Defendants appeal from this judgment.

## II.

Defendants raise numerous issues on appeal which they categorize in their brief under eight "assignments of error." In response, plaintiff's brief on appeal identifies 26 separate issues raised by defendants on appeal. For purposes of our analysis, we will discuss each of the issues as they relate to the various causes of action as set forth in plaintiff's complaint.

## A. RICO

Most of the defendants' claims of error relate to the jury's finding of liability under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(c), which provides:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

In *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985), the Supreme Court set forth the elements which must be alleged in order to state a claim under section 1962(c): "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." 473 U.S. at 496, 105 S.Ct. at 3285. The definition of "racketeering activity," contained in

section 1961(1), refers to a variety of federal offenses including mail fraud, 18 U.S.C. § 1341, and wire fraud, 18 U.S.C. § 1343. The definitional section of the RICO statute also provides that " 'a pattern of racketeering activity' requires at least two acts of racketeering activity...." 18 U.S.C. § 1961(5).

On appeal, defendants repeatedly contend that the "trial court erred" in finding liability and assessing damages under RICO and the other causes of action. This case, however, was submitted to, and decided by, a jury. Therefore, we assume that the defendants are arguing that the trial court erred by refusing to grant their motion for a directed verdict and that they were entitled to judgment as a matter of law.

### 1. Predicate Acts Under RICO

■ Defendants contend that the plaintiff failed to present sufficient evidence of mail fraud and/or wire fraud. The elements of mail fraud are (1) a scheme to defraud and (2) a mailing for the purpose of executing the scheme. *Pereira v. United States*, 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954). It is sufficient to show that the use of the mails could have been reasonably anticipated. *Id.* The question of fraudulent intent under section 1341 is left for the jury to determine. *United States v. Hopkins*, 357 F.2d 14 (6th Cir.), *cert. denied*, 385 U.S. 858, 87 S.Ct. 107, 17 L.Ed.2d 84 (1966).

■ The elements of wire fraud, 18 U.S.C. § 1343, are (1) a scheme to defraud and (2) the use of an interstate electronic communication in furtherance of the scheme. *United States v. Cowart*, 595 F.2d 1023 (5th Cir.1979). This court has held that the wire fraud statutory language should be interpreted with the same breadth as the analogous language in the mail fraud statute. *United States v. Calandrella*, 605 F.2d 236, 253 (6th Cir.), *cert. denied sub nom. Kaye v. United States*, 444 U.S. 991, 100 S.Ct. 522, 62 L.Ed.2d 420 (1979).

■ Defendants argue that there was no proof of any mailings. The record, however, shows that the defendants used mailings to advertise their tax/insurance seminars. Moreover, the record shows that Fletcher's attorney, Neil Christal, sent a letter dated July 23, 1979, to the plaintiff's employer stating that the employer was required to adjust plaintiff's paychecks in order to reflect the numerous withholdings claimed on her revised W-4 form. In addition, Fletcher sent several letters to the plaintiff which she then sent to the IRS over her signature. Finally, Fletcher personally prepared several of plaintiff's annual tax forms and instructed the plaintiff to sign them and mail them to the IRS.

Defendants argue that the tax return mailings are mandated by law, and therefore the mailing of fraudulently prepared tax returns is protected from mail fraud liability. This court has previously rejected a similar argument in *United States v. Shermetaro*, 625 F.2d 104, 111 (6th Cir. 1980), wherein we held that the mailing of false tax returns constituted a violation of 18 U.S.C. § 1341. Moreover, the Court of Appeals for the Ninth Circuit has recently held that the mailing of fraudulent tax returns is indictable as mail fraud under section 1341 and that such violations can serve as predicate acts of racketeering under RICO. *United States v. Busher*, 817 F.2d 1409, 1412 (9th Cir.1987). In addition, even if the plaintiff's falsified tax returns were not considered, there still remains ample evidence in the record from which a jury could find individual acts of mail fraud on the part of defendants based on the written correspondence between Fletcher and plaintiff.

■ Defendants also argue that there was no evidence of wire fraud. Once again, however, the record contains an abundance of evidence demonstrating interstate telephone calls between plaintiff, Fletcher, and his associates in California, in order to discuss the audits of the plaintiff's taxes.

■ The defendants also argue that there was no evidence of a fraudulent scheme that would constitute a violation of the mail fraud or wire fraud acts. We

disagree. It is undisputed that the defendant induced plaintiff to purchase substantial amounts of life insurance by falsely representing to her that she could completely avoid future payments of federal income taxes. Defendants promised that they would continue to provide advice and assistance in maintaining records and preparing plaintiff's income tax returns and would provide further assistance in the event that plaintiff's returns were audited. Defendants did, in fact, continue to advise plaintiff on her taxes from 1979 through 1983 and repeatedly instructed her to claim withholdings and deductions that were clearly not allowable under the Internal Revenue Code. Thus, the mailings and wire communications which occurred after the plaintiff initially agreed to purchase the life insurance policies were in furtherance of the scheme to defraud, since the defendants continued to dupe the plaintiff into believing that she would not be liable for federal income taxes and, thereby, lulled her into a false sense of security.

Defendants also argue that plaintiff should have been required to prove fraud by "clear and convincing evidence." Moreover, defendants seem to suggest that plaintiff should have been required to meet a higher burden of proof because a finding of liability under RICO implicates criminal wrongdoing on the part of defendants. We disagree.

The allegations of fraud set forth in the plaintiff's complaint were sufficiently specific to meet the requirements for pleading under Fed.R.Civ.P. 9(b). We find ample evidence in the record which would support the jury's conclusion that defendants engaged in a scheme to defraud for purposes of establishing mail fraud and wire fraud as predicate acts for violation of RICO.

### 2. *"Enterprise" Element of RICO*

█ Defendants contend on appeal that there was no proof at trial of a separate ongoing "enterprise" for purposes of establishing liability under section 1962(c) of RICO. This argument is without merit. It is undisputed that defendant Fletcher formed a separate entity known as the Fletcher–McKelvie Group for the purpose of selling insurance policies in conjunction with the tax seminars which Fletcher and his associates, including defendant Johnson, conducted throughout the country. The definitional section of RICO states that an "enterprise" includes:

Any individual, partnership, corporation, association, or other legal entity and any union or group of individuals associated in fact although not a legal entity.

18 U.S.C. § 1961(4). We note that some appellate courts have adopted a narrow definition of the term "enterprise" by requiring the plaintiff to establish that the "enterprise" was engaged in "continuing" criminal activity involving more than a "single criminal episode." *See, e.g., Beauford v. Helmsley*, 843 F.2d 103 (2d Cir. 1988). In discussing the enterprise requirement under RICO, this court has stated, "RICO applies both to legitimate enterprises conducted through racketeering operations as well as illegitimate enterprises." *United States v. Qaoud*, 777 F.2d 1105, 1115 (6th Cir.1985) (citing *United States v. Turkette*, 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981)). In *Qaoud* we held that although "enterprise" and "pattern of racketeering activity" are separate elements, they may be proved by the same evidence.

In the instant case, we need not define the exact parameters of the "enterprise" under RICO. Regardless of whether the activities of the Fletcher–McKelvie Group are characterized as being entirely criminal in nature or are only partially so, it was clearly an independent organization through which defendants sold life insurance policies to scores of clients across the country by enticing them with false claims that the clients could reduce or even eliminate their federal income tax liability. Given these circumstances, we find that the Fletcher–McKelvie Group constituted a separate RICO enterprise under any recognized definition of the statutory term.

### 3. *"Pattern of Racketeering Activity"*

█ The defendants also contend that there was insufficient evidence to show a

"pattern of racketeering activity" on their part. There is a wide divergence of opinion among the appellate courts as to what exactly constitutes a "pattern" within the meaning of the RICO statute.* The definitional section of RICO defines a "pattern of racketeering activity" as requiring "at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5). Some courts have adopted a broad literal interpretation of the statutory definition of "pattern of racketeering activity" and have held that the commission of two single predicate acts is sufficient to establish a "pattern." *See, e.g., United States v. Ianniello,* 808 F.2d 184, 190 (2d Cir.1986), *cert. denied sub nom. Cohen v. United States,* 483 U.S. 1006, 107 S.Ct. 3229, 97 L.Ed.2d 736 (1987); *California Architectural Building Prods. v. Franciscan Ceramics, Inc.,* 818 F.2d 1466, 1469 (9th Cir.1987), *cert. denied,* 484 U.S. 1006, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988). Other courts have attempted to restrict the scope of RICO by requiring the plaintiff to establish the existence of "multiple schemes" in order to establish a "pattern of racketeering activity." *See, e.g., Superior Oil Co. v. Fulmer,* 785 F.2d 252, 257 (8th Cir.1986). *Cf. International Data Bank Ltd. v. Zepkin,* 812 F.2d 149 (4th Cir.1987) (adopting a case-by-case analysis and holding that ten separate acts of mail fraud did not establish a pattern of racketeering activity where all of the mailings were in furtherance of a "single, limited fraudulent scheme."). Other courts have also purported to adopt a "case-by-case approach." *See, e.g., Barticheck v. Fidelity Union Bank,* 832 F.2d 36 (3d Cir.1987); *Lipin Enterprises, Inc. v. Lee,* 803 F.2d 322, 323 (7th Cir.1986); *Garbade v. Great Divide Mining and Milling Corp.,* 831 F.2d 212 (10th Cir.1987).

In the instant case, it is undisputed that the defendants sold millions of dollars worth of insurance policies to scores of individual clients throughout the country by means of a fraudulent promotion whereby the defendants falsely represented that the potential investors could completely avoid payment of any future federal income taxes. The defendants carried out their fraudulent activities over the course of several years under the auspices of the Fletcher–McKelvie Group and duped numerous investors including the plaintiff in this case. Accordingly, we find that even under the narrowest interpretations of the pattern requirement under RICO, the defendants could be found to have engaged in a pattern of racketeering activity.

■ Finally, defendants contend that the plaintiff's cause of action under RICO was barred by the applicable statute of limitations. The trial court in this case instructed the jury to apply a four-year statute of limitations to federal RICO claims in accordance with the most closely analogous Ohio statute of limitations. Subsequently, the United States Supreme Court has held that a four-year statute of limitations applies to all civil actions brought under RICO. *Agency Holding Corp. v. Malley–Duff & Associates,* 483 U.S. 143, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987).

In the instant case, the defendants agree that a four-year statute of limitations applies to the plaintiff's RICO claim; however, defendants assert that plaintiff's claim accrued more than four years prior to the filing of her complaint. The trial court correctly instructed the jury to determine whether the plaintiff knew or should have known of the defendants' fraudulent scheme before October 1, 1981. The undisputed facts in the record show that the plaintiff continued to rely on the defendants' help in preparing her tax forms through 1983 and that the defendants continued to reassure her that she could avoid the payment of taxes and any penalties assessed by the IRS. Defendant Fletcher continued to represent plaintiff before the IRS until early 1985. Plaintiff eventually

---

* The Supreme Court considered these conflicting approaches following the issuance of this decision. *See H.J. Inc. v. Northwestern Bell Tel. Co.,* ⸺ U.S. ⸺, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989).

filed suit in October of that year. Under these circumstances, we find that the facts in the record would enable the jury to conclude that the plaintiff filed her RICO claim against defendants within the requisite four-year period of limitations.

B. Ohio Consumer Sales Practices Act

On appeal defendants contend that they should not have been held liable under the Ohio Consumer Sales Practices Act, Ohio Rev.Code Ann. § 1345.01, *et seq.*, because their activities did not fall within the scope of the statute. In general, the Ohio Consumer Sales Practices Act prohibits two types of consumer sales practices: those which are "unfair or deceptive" and those which are "unconscionable." The instructions to the jury regarding "unfair or deceptive" sales practices were based on the relevant statutory language found in Ohio Rev.Code Ann. § 1345.02, which provides:

(A) No supplier shall commit an unfair or deceptive act or practice in connection with a consumer transaction. Such an unfair or deceptive act or practice by a supplier violates this section whether it occurs before, during, or after the transaction.

(B) Without limiting the scope of division (A) of this section, the act or practice of a supplier in representing any of the following is deceptive:

. . . .

(10) That a consumer transaction involves or does not involve a warranty, a disclaimer of warranties or other rights, remedies, or obligations if the representation is false.

The jury was also instructed on "unconscionable consumer sales practices" as defined in Ohio Rev.Code Ann. § 1345.03:

(A) No supplier shall commit an unconscionable act or practice in connection with a consumer transaction. Such an unconscionable act or practice by a supplier violates this section whether it occurs before, during, or after the transaction.

(B) In determining whether an act or practice is unconscionable, the following

circumstances shall be taken into consideration:

. . . .

(6) Whether the supplier knowingly made a misleading statement of opinion on which the consumer was likely to rely to his detriment. . . .

On appeal, defendants argue that their activities do not fall within the statutory definition of "consumer transactions," contained in section 1345.01(A) (Anderson Supp.1987), which provides in part:

(A) "Consumer transaction" means a sale, lease, assignment, award by chance, or other transfer of an item of goods, a service, a franchise, or an intangible, to an individual for purposes that are primarily personal, family, or household, or solicitation to supply any of these things.

First, defendants argue that the sale of insurance is specifically exempted from the provisions of the Consumer Sales Practices Act under section 1345.21(F)(4) (Anderson Supp.1987), which provides:

(F) "Consumer goods or services" do not include goods or services pertaining to any of the following:

. . . .

(4) The sale of insurance by a person licensed by the superintendent of insurance. . . .

There are several flaws in the defendants' argument. First, the statutory exception cited by the defendants is contained in a special definitional section which only applies to sections 1345.21 through 1345.28 of the Ohio Revised Code. These sections set forth specific additional requirements which apply to transactions involving "home solicitations." Section 1345.28 provides:

Failure to comply with sections 1345.21 to 1345.27 of the Revised Code [home solicitation sales] constitutes a deceptive act or practice in connection with a consumer transaction in violation of section 1345.02 of the Revised Code.

Thus, special provisions applying to "home solicitation sales" are in addition to the general provisions which govern consumer sales practices. Therefore, even if

the sales of insurance policies are not covered by the additional requirements of home solicitation sales, they are still subject to the general regulations under the Consumer Sales Practices Act sections 1345.02 and 1345.03. We further note that section 1345.13 of the Revised Code specifically provides:

> The remedies in sections 1345.01 to 1345.13 of the Revised Code, are in addition to the remedies otherwise available for the same conduct under state or local law.

Furthermore, the sale of insurance was only a part of the total package of goods and services which the defendants sold to plaintiff. Indeed, it appears that the only reason that the plaintiff purchased the insurance was because the defendants claimed that it was a necessary prerequisite for her participation in their tax planning services. Plaintiff received a written document from defendants entitled "Declaration of Services" under which defendants promised to provide the following services:

> 1. Advise on establishing your daily expense records and bookkeeping systems.
> 2. Assistance where possible in explaining to you the home-based business income and expenses authorized by the Internal Revenue Code as pointed out to us by our accountant and attorney.
> 3. After preparation of your returns in accordance with IRS standards, should you need support for Revenue audits or representative assistance on points we have made, we will secure the services of our attorney to represent you.

Most importantly, defendants promised plaintiff that her participation in the program would result in a total elimination of her personal federal income tax liability. Thus, the undisputed evidence in the record demonstrates that the total package of services sold by defendants included much more than simply an insurance policy and therefore clearly fell within the scope of the Ohio Consumer Sales Practices Act.

Finally, defendants argue that their activities do not fall within the definition of a "consumer transaction" because they did not involve the sale of goods or services "to an individual for purposes that are primarily personal, family, or household." Defendants argue that their services were directed at plaintiff's home-based business and thus were not provided for her "personal use." This argument is without merit. It is clear that the defendants' tax planning program was directed at reducing the plaintiff's *personal* income tax liability and was explained to her as such. The creation and operation of a home-based business was merely incidental to the overall goal of eliminating her personal tax liability.

Based on the undisputed facts contained in the record, we find that there is ample evidence from which the jury could conclude that the defendants violated the provisions of the Ohio Consumer Sales Practices Act.

■■■ Defendants also argue that plaintiff failed to comply with the two-year statute of limitations applicable to actions brought under the Ohio Consumer Sales Practices Act. *See* Ohio Rev.Code Ann. § 1345.10(C) (an action under sections 1345.01–1345.13 of the Revised Code may not be brought more than two years after the occurrence of the violation which is the subject of suit). Defendant argues that the "transaction" was completed in June of 1979 when plaintiff signed the contract to purchase life insurance policies from New York Life. The relevant statutory provisions, however, state that "an unfair or deceptive act or practice by a supplier violates this section whether it occurs before, during, *or after* the transaction." Ohio Rev.Code Ann. § 1345.02(A) (emphasis added). *See also* Ohio Rev.Code Ann. § 1345.03(A). The facts in the record show that the defendants continued to provide their "tax service" to plaintiff until the early part of 1985. Up until that point, defendants continued to assure plaintiff that she would not have to pay any taxes or penalties to the IRS. These continued assurances and blatantly improper advice could constitute deceptive or unconscionable practices under the Ohio Act. Therefore, since plaintiff filed suit on October 2, 1985, the jury could have reasonably found

that plaintiff complied with the statutory two-year limitations period set forth in section 1345.10(C).

## C.  Breach of Contract

■ Plaintiff's claim for breach of contract is based primarily on the defendants' promise that plaintiff would not have to pay any federal income taxes if she participated in the defendants' financial plan. Defendants maintain that such a contract would be illegal, and hence, unenforceable, because it would be void against public policy. We note, however, that under some circumstances an individual may use legal means to avoid the payment of federal income taxes. Moreover, the defendants repeatedly assured plaintiff that their tax scheme was completely legal. Under these circumstances, we find that public policy does not prohibit plaintiff from bringing a breach of contract claim against defendants based on their failure to provide a legal means through which plaintiff could eliminate her federal income tax liability.

## D.  Breach of Fiduciary Duty

■ Defendants argue that there was no special relationship between the plaintiff and the defendants which would give rise to a fiduciary duty. This argument is without merit. It is undisputed that defendants induced plaintiff to enter into their financial plan under the assumption that she would be shielded from paying federal income taxes. Under the agreement, defendants promised to provide plaintiff with continuing tax advice and assistance in the preparation of her financial records. Moreover, defendants promised to represent plaintiff before the IRS and the undisputed facts in the record demonstrate that Fletcher did in fact take an active role in responding to audits conducted by the IRS. In addition, defendant Johnson prepared plaintiff's W–4 forms and instructed her on various methods of record keeping for tax purposes.

■ Under Ohio law, a de facto fiduciary relationship may result from a confidential relationship, and the existence of such a relationship is a question of fact to be determined by the jury. *See, e.g., Prudential Ins. Co. v. Eslick,* 586 F.Supp. 763, 766 (S.D.Ohio 1984). Given the facts in the instant case, we find ample evidence in the record to support the jury's conclusion that a fiduciary relationship existed between plaintiff and defendants and that defendants breached that duty thereby causing plaintiff to suffer extreme financial hardship.

## E.  Common Law Fraud

■ Defendants claim that there was no basis for a finding of liability under a theory of common law fraud because the allegedly fraudulent representation, i.e., the guaranty of zero income tax liability, related to the occurrence of a future event. We find, however, that based on the evidence presented at trial the jury could reasonably conclude that defendants knew that their representations were false at the time they were made and that their scheme would not result in the elimination of the plaintiff's federal income tax liability as they had promised. Under these circumstances, where there is substantial evidence to show that the defendants knowingly made a false promise regarding the benefits of their services, we find that defendants could be held liable under a common law theory of fraud.

## F.  Miscellaneous

Defendants also raise several claims of error regarding various evidentiary issues and the court's calculation of damages. We have considered each of these issues and find them without merit.

Accordingly, for the foregoing reasons, the jury verdict awarding damages to plaintiff is AFFIRMED.