# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 02-2307

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the Eastern |
| | * | District of Arkansas. |
| | * | |
| Donald Stuart Fletcher, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted:  December 10, 2002

Filed:  March 6, 2003

_____

Before BOWMAN, MORRIS SHEPPARD ARNOLD, and RILEY, Circuit Judges.

_____

MORRIS SHEPPARD ARNOLD, Circuit Judge.

A jury convicted Donald Fletcher of one count of conspiracy to defraud the United States, *see* 18 U.S.C. § 371, and two counts of aiding and assisting in the preparation or presentation of false income tax returns, *see* 26 U.S.C. § 7206(2). The district court[1] sentenced Mr. Fletcher to seventy-one months in prison. Mr. Fletcher appeals his convictions, arguing that the evidence was insufficient, that the

_____

[1]The Honorable Stephen M. Reasoner, United States District Judge for the Eastern District of Arkansas.

government introduced evidence outside the scope of the indictment, that the district court erred in admitting evidence of prior civil adjudications resulting from Mr. Fletcher's past provision of tax services, and that the indictment was insufficient. Mr. Fletcher also appeals his sentence, contending that the district court abused its discretion in departing upward based on the prior civil adjudications. We affirm.

I.

This case arises out of Mr. Fletcher's involvement in James Otis & Company (JO&C), a California company that provided tax consultation, tax preparation, and audit representation services to self-employed taxpayers in Arkansas. The essence of the charges was that Mr. Fletcher conspired with William Webber, Jr., Deborah Rogers, and Ryan Rogers to prevent the Internal Revenue Service (IRS) from determining JO&C's clients' income and tax liabilities, and induced taxpayers to file false tax returns with the IRS. (Mr. Webber, Mr. Rogers, and Mrs. Rogers all pleaded guilty shortly before trial, leaving Mr. Fletcher as the sole defendant.) A brief outline of the scheme follows.

After Mr. Rogers had recruited a sufficient number of prospective clients in Arkansas, Mr. Fletcher would travel to Arkansas and conduct seminars promoting JO&C's tax services. During the seminars, Mr. Fletcher advocated reducing or eliminating tax liability by converting what appeared to be ordinary personal expenditures into tax deductible business expenses. Following these seminars, Mr. Fletcher and Mr. Rogers together, or Mr. Rogers alone, met with individual prospective clients. If persuaded to use JO&C's services, the clients signed a JO&C "participation agreement" that Mr. Fletcher designed. Clients agreed to pay JO&C either 5.5% of their gross income or an amount equal to half of the tax savings that resulted from JO&C's services (savings often generated by amending previous years' returns to create larger tax refunds). Mr. and Mrs. Rogers provided tax consultation and audit representation services to the Arkansas clients, while Mr. Webber

supervised and assisted a staff in preparing tax returns and audit documentation for them.

JO&C furnished the Arkansas clients with tax data organizers, more commonly referred to as workbooks, to record income and business expenses for tax purposes. The Arkansas clients, on the basis of advice received through JO&C, recorded ordinary personal expenditures as tax deductible business expenses. For example, one client who operated a home-based day care center deducted veterinary and food costs for her family pets as security and rodent control expenses. A doctor and his wife deducted as a business travel expense a wholly personal one-night trip to Las Vegas to get married; that same couple deducted as a security expense $17,384 in health care costs incurred for the heart condition of the wife's intravenously-fed, non-mobile, eleven-year old German shepherd. A dentist deducted $12,000 in wages allegedly paid to his minor children, when no such wages were in fact paid. At times, the tax preparers themselves inflated the clients' expenses. For example, one client's workbook estimate of $3,277 in farm expenses was increased to $54,893 on his tax return.

Ultimately, JO&C's clients' tax returns prompted an investigation and audits by the IRS. When informed of the investigation, Mr. Fletcher instructed his colleagues and clients to delay the audit process for as long as possible. Mr. and Mrs. Rogers also advised clients that, if asked by the IRS who prepared the tax returns, they should respond that they prepared the returns themselves. Generally, the tax preparers did not sign the amended returns or signed them illegibly in order to avoid a connection between the preparer and the return. During the audit process, Mr. Fletcher encouraged the fabrication of, and Mr. Webber and Mr. and Mrs. Rogers fabricated, records to support the Arkansas clients' deductions by, for example, creating phony invoices for professional services or false calendar entries for business meetings.

II.

Mr. Fletcher argues that the evidence was insufficient to sustain his convictions. On appeal from a conviction, we must view the evidence in the light most favorable to the verdict, giving the government the benefit of all reasonable inferences. *United States v. Peterson*, 223 F.3d 756, 759 (8th Cir. 2000), *cert. denied*, 531 U.S. 1175 (2001). "We will reverse the conviction[] only if we can conclude from the evidence that a reasonable fact finder must have entertained a reasonable doubt about the government's proof concerning one of the essential elements of the crime." *United States v. McCarthy*, 97 F.3d 1562, 1568 (8th Cir. 1996), *cert. denied*, 519 U.S. 1139 and 520 U.S. 1133 (1997).

Mr. Fletcher was charged under the portion of 18 U.S.C. § 371 that proscribes conspiracies to defraud the United States by " 'impairing, obstructing, or defeating the lawful function of any department of [the G]overnment.' " *United States v. Derezinski*, 945 F.2d 1006, 1011 (8th Cir. 1991) (quoting *Haas v. Henkel*, 216 U.S. 462, 479 (1910)) (alteration in *Derezinski*). In particular, the indictment alleged a conspiracy to defraud the IRS in the function of assessing and collecting taxes, commonly known as a *Klein* conspiracy. *See United States v. Ervasti*, 201 F.3d 1029, 1037 (8th Cir. 2000); *United States v. Klein*, 247 F.2d 908 (2d Cir. 1957), *cert. denied*, 355 U.S. 924 (1958). To convict a defendant of a *Klein* conspiracy, the government must show the existence of an agreement to defraud the IRS and an overt act by one of the conspirators in furtherance of the agreement's objectives. *See United States v. Zimmerman*, 832 F.2d 454, 457 (8th Cir. 1987) (per curiam); *see also United States v. Furkin*, 119 F.3d 1276, 1279 (7th Cir. 1997); *United States v. Alston*, 77 F.3d 713, 720 n.17 (3d Cir. 1996); *United States v. Shoup*, 608 F.2d 950, 956 (3d Cir. 1979); *United States v. Vogt*, 910 F.2d 1184, 1202 (4th Cir. 1990), *cert. denied*, 498 U.S. 1083 (1991). Mr. Fletcher contends that the government failed to prove the existence of, and his knowing participation in, any conspiracy to defraud the IRS. We believe that the evidence demonstrates otherwise.

Although Mr. Fletcher and every other individual working with JO&C considered themselves to be "independent contractors," testimony at trial suggested that Mr. Fletcher controlled JO&C. Becky Mears, who performed administrative work for JO&C, testified that there was no distinction between Mr. Fletcher and JO&C. Barbara Nofrey, who performed administrative work for Mr. Fletcher and Mr. Webber, testified that Mr. Fletcher was the "head honcho" and controlled JO&C. Ms. Nofrey further testified that Mr. Fletcher directed JO&C to pay Mr. Webber for the tax return preparation work and that Mr. Fletcher was Mr. Webber's boss. Mr. Webber testified that Mr. Fletcher brought in the funds, allocated how money would be spent, and decided how the business would work. Mr. Webber also testified that, despite Mr. Webber's concern that amended returns had a high audit rate, Mr. Fletcher insisted that Mr. Webber prepare amended returns because "they would provide for consistent income" to JO&C.

A videotape of Mr. Fletcher's seminar promoting JO&C's tax services and related trust services reflects that Mr. Rogers introduced Mr. Fletcher as "the head of our tax service department out of California." Mr. Fletcher repeatedly used the term "we" in describing JO&C's services at the seminar, explaining, for example, "[W]e do tax workbooks ... where we will show you ... based on a workbook, before you do your tax returns what the numbers really should be." This is consistent with Ms. Nofrey's testimony that Mr. Fletcher met with at least one (unidentified) Arkansas client and, using tax software on his laptop computer, prepared draft tax returns, taking information from the client in order "to get an idea what their potential expenses could or should be to make their refunds come out to be a certain dollar amount."

Also during the seminar, Mr. Fletcher stated "we can help you. You can get your tax money back. You can make sure you don't pay any more for the next twenty years." Mr. Fletcher explained, "the whole secret that we're talking about ...

is to convert personal expenses into business expenses ... and the businesses that are reimbursing your expenses are totally deductible because, they're not persons driving cars or having meals or living in houses and therefore, all the stuff that wasn't deductible yesterday is deductible." Mr. Fletcher also told the prospective clients that JO&C knew of "secret" provisions hidden in the Internal Revenue Code, provisions accountants and attorneys were not trained in, and that his method was not taught at business schools such as Harvard and Stanford. Although Mr. Rogers delivered much of the advice that was rendered directly to taxpayers, that advice, as taxpayers described it at trial, was entirely consistent with Mr. Fletcher's comments during the seminar about deducting a cat as a "rodent control device," or $500 for dog food as a "security device," or even a bird as "aerial surveillance."

Contrary to Mr. Fletcher's assertion, then, there is ample evidence from which the jury could have found, beyond a reasonable doubt, that Mr. Fletcher and others had the intent necessary to defraud the United States in its efforts to collect taxes. We cite as evidence of one particularly egregious example Mrs. Rogers's testimony that, in the face of an IRS audit, Mr. Fletcher instructed her to create a phony invoice to support a $1,275 deduction of legal and professional expenses on an amended tax return filed on behalf of two Arkansas clients. From this exchange alone the jury could certainly infer a purpose to defraud the government by interfering with IRS functions, and the rest of the evidence that we have rehearsed further supports that conclusion. We note, moreover, that the "requisite agreement need not be express, but rather can be an informal tacit understanding between the coconspirators and can be proved entirely by circumstantial evidence." *Ervasti*, 201 F.3d at 1038 (internal citation and punctuation omitted). We believe, therefore, that the government presented sufficient evidence to support Mr. Fletcher's conviction on the conspiracy count.

Mr. Fletcher was also charged with aiding in the preparation and presentation of false tax returns, *see* 26 U.S.C. § 7206(2). Of the original sixteen false return counts, the jury convicted Mr. Fletcher on two counts, both pertaining to the tax returns of James and Ginger McNair; a mistrial was declared on the remaining counts. The false return counts require the government to prove that Mr. Fletcher "[w]illfully aid[ed] or assist[ed] in, or procure[d], counsel[ed], or advise[d] the preparation or presentation ... of a return ... which is fraudulent or is false as to any material matter." 26 U.S.C. § 7206(2)*; see Ervasti*, 201 F.3d at 1040-41. Liability under 26 U.S.C. § 7206(2) is not limited to return preparers; the statute reaches all knowing participants in the fraud. *See United States v. Rowlee*, 899 F.2d 1275, 1279 (2d Cir. 1990), *cert. denied*, 498 U.S. 828 (1990); *United States v. Hooks*, 848 F.2d 785, 791 (7th Cir. 1988); *United States v. Crum*, 529 F.2d 1380, 1382 (9th Cir. 1976); *United States v. Maius*, 378 F.2d 716, 718 (6th Cir. 1967), *cert. denied*, 389 U.S. 905 (1967).

We believe that the government presented sufficient evidence to support Mr. Fletcher's conviction on the false return counts pertaining to Dr. and Mrs. McNair. It was as a result of attending Mr. Fletcher's seminar in 1994 that the McNairs retained JO&C to implement Mr. Fletcher's tax strategy of converting ordinary personal expenses into business expenditures. Mr. Webber testified that Mr. Fletcher's handwriting appears on a page of the McNairs' participation agreement that explained the McNairs' fees and suggested investments. With JO&C's (and in particular the Rogerses') assistance, the McNairs filed an amended tax return for 1991; on this return they deducted as business expenses a purely personal trip to Las Vegas to get married and costs associated with the care of Mrs. McNair's sick dog. On their 1994 tax return, they again deducted the dog-related expenses, as well as thousands of dollars in auto and travel costs to and from a "rental home" that was in fact in their front yard and occupied by Mrs. McNair's mother. Mrs. McNair testified that she became concerned about JO&C's tax preparation services, challenging, for example, the omission of the paid preparer's signature from the return. We find

particularly telling Mrs. McNair's testimony that she addressed her questions and concerns not only to Mr. and Mrs. Rogers, but also to Mr. Fletcher on one occasion. From this evidence, the jury could certainly find that Mr. Fletcher willfully aided, assisted in, procured, counseled, or advised the preparation or presentation of the McNair's false and fraudulent income tax returns.

Finally, Mr. Fletcher's "free speech" argument is wholly unavailing. There was ample evidence that Mr. Fletcher did more than merely advocate, through speech, violation of the tax laws. *See United States v. Buttorff*, 572 F.2d 619, 623-24 (8th Cir. 1978) (citing *Brandenburg v. Ohio*, 395 U.S. 444 (1969)), *cert. denied*, 437 U.S. 906 (1978). Mr. Fletcher was not prosecuted for speech alone, but rather for his role, as outlined above, in the fraud that the JO&C actors actually perpetrated against the United States. *See, e.g., id.* at 624. We note, moreover, that as a result of Mr. Fletcher's seminars (where he explained how to convert ordinary personal expenditures into tax deductible business expenses) and his follow-up meetings with clients, his clients not only retained JO&C's tax services for the current year, they began the process of filing amended tax returns for previous years. In these circumstances, Mr. Fletcher's speech is not entitled to first amendment protection.

## III.

Mr. Fletcher next argues that the district court erred in failing to grant a mistrial during Mr. Webber's testimony. At trial, Mr. Webber testified that he attended client appointments with Mr. Fletcher where Mr. Fletcher advised the clients how to complete the workbooks. According to Mr. Webber, when clients were unable to come up with a dollar amount for their business expenses, Mr. Fletcher would choose a random number by, for example, opening the phone book and having the client point to a number.

Initially, the district court overruled Mr. Fletcher's objection to this testimony. On cross-examination, however, it was revealed that these appointments occurred sometime in 1991 or 1992, well outside the conspiracy period of "on or about August 1, 1994 through December 1996." The district court then instructed the jury to disregard the testimony but refused to grant Mr. Fletcher's motion for a mistrial. Mr. Fletcher argues that the district court abused its discretion in failing to grant his motion for mistrial. We disagree. "The admission of allegedly prejudicial testimony is ordinarily cured by an instruction to the jury to disregard the testimony." *United States v. Nelson*, 984 F.2d 894, 897 (8th Cir. 1993), *cert. denied*, 508 U.S. 966 (1993). In this case, the district court clearly and promptly admonished the jury not to consider Mr. Webber's testimony about workbook appointments. We assume that the jury followed the district court's instruction. *See United States v. Maza*, 93 F.3d 1390, 1397 (8th Cir. 1996), *cert. denied*, 519 U.S. 1138 and 520 U.S. 1160 (1997). We note further that in its final charge to the jury, the district court fortified its earlier instruction by reminding the jury that "[t]estimony that I struck from the record, or told you to disregard, is not evidence and must not be considered." Considering the district court's curative instruction in context with the entire trial, including the strength of the government's evidence rehearsed above, we cannot say that the jury "was substantially swayed in spite of the instruction." *See id.*

Mr. Fletcher also argues that the district court should have granted a mistrial because of prosecutorial misconduct during the government's closing argument. In particular, Mr. Fletcher asserts that the government based arguments on excluded evidence and made misleading and confusing statements to the jury. Because Mr. Fletcher did not object to these incidents, however, we review the district court's decision not to grant a mistrial *sua sponte* for plain error. "Under plain error, the question for determination is whether the argument was so prejudicial as to have affected substantial rights resulting in a miscarriage of justice." *United States v. Griffith*, 301 F.3d 880, 883 (8th Cir. 2002) (internal quotations omitted). "Plain error

review is extremely narrow and is limited to those errors which are so obvious or otherwise flawed as to seriously undermine the fairness, integrity, or public reputation of judicial proceedings." *United States v. Beck*, 250 F.3d 1163, 1166 (8th Cir. 2001).

Our examination of the record reveals that Mr. Fletcher is correct that the government improperly referred to excluded evidence during its closing argument. It is a well-established principle that the government must not urge a jury to convict for reasons other than the evidence properly before the jury. *See United States v. Tulk*, 171 F.3d 596, 599-600 (8th Cir. 1999); *United States v. Beckman*, 222 F.3d 512, 527 (8th Cir. 2000). In this case, the government twice referred, albeit briefly, to the excluded portion of Mr. Webber's testimony concerning Mr. Fletcher's use of a phonebook to divine a number for business expenses.

Likewise, it is apparent from the trial transcript that during closing argument, the government erroneously referred to the McNairs' participation agreement as a workbook. The significance of these references is that Mr. Fletcher's handwriting appeared within that participation agreement, on a page explaining the McNairs' fees and suggested investments. Mr. Fletcher contends that by erroneously referring to it as a workbook, the government suggested that Mr. Fletcher helped fill out a taxpayer workbook.

In assessing whether Mr. Fletcher was prejudiced by the government's improper remarks, we consider "the cumulative effect of any misconduct, the strength of the properly admitted evidence, and any curative actions taken by the trial court." *Tulk*, 171 F.3d at 599. In the present case, we do not find circumstances warranting reversal on the basis of prosecutorial misconduct because Mr. Fletcher has not shown that he was prejudiced. We believe that the incriminating evidence admitted against Mr. Fletcher was quite convincing and that he would have been convicted regardless of the government's improper or confusing remarks. We note further that the district

court instructed the jury that "statements, arguments, questions, and comments by lawyers ... are not evidence." While the government may have confused the participation agreement with a workbook in closing argument, the government referred to the correct exhibit number for the particular page in question, and so the jury could easily have located and reviewed the document and discovered its true nature. Finally, with regard to the telephone book testimony, counsel for Mr. Fletcher opened his closing argument by reminding the jury of the district court's earlier instructions to disregard Mr. Webber's telephone book testimony. While we disapprove of the government's references to evidence previously excluded, and find unfortunate the government's references to the participation agreement as a workbook, we do not believe that those references worked to undermine Mr. Fletcher's substantial rights in any significant way. The district court did not abuse its discretion in failing to grant a mistrial *sua sponte*.

## IV.

Mr. Fletcher also asserts that the district court abused its discretion by admitting evidence of prior civil adjudications arising out of Mr. Fletcher's past provision of tax services. Prior to trial, the government notified Mr. Fletcher of its intent to introduce evidence of two civil actions (in which Mr. Fletcher was successfully sued for common law fraud, breach of fiduciary duty, breach of contract, violations of Ohio consumer protection laws, and, in one case, civil violations of RICO, *see* 18 U.S.C. § 1962(c), and common law conspiracy) pursuant to Fed. R. Evid. 404(b) as proof of motive, intent, plan, knowledge and absence of mistake or accident. *See Davis v. Mutual Life Ins. Co.*, 6 F.3d 367 (6th Cir. 1993), *cert. denied*, 510 U.S. 1193 (1994); *Hofstetter v. Fletcher*, 905 F.2d 897 (6th Cir. 1988). At the beginning of Mr. Florez's testimony, the district court instructed the jury that the evidence of prior civil adjudications was not to be considered as proof that Mr. Fletcher committed the charged offenses.

Mr. Fletcher faults the district court for admitting the testimony of Michael Florez, an attorney from Ohio who represented the plaintiffs in these civil actions. Specifically, Mr. Fletcher argues that Mr. Florez's testimony constituted impermissible hearsay. Although Mr. Fletcher lodged several hearsay objections during the course of Mr. Florez's testimony at trial, in his brief on appeal he does not identify with particularity the evidence that he believes should have been excluded. Our independent review of Mr. Fletcher's objections convinces us that much of the testimony objected to was properly admitted because it was not hearsay at all.

Mr. Fletcher objected, for example, to Mr. Florez's statement that the *Hofstetter* and *Davis* plaintiffs' tax returns "were either prepared at Mr. Fletcher's direction ... if he didn't write in the numbers, he instructed the individuals to write in certain numbers." But Mr. Florez testified that he learned this information directly from Mr. Fletcher during the course of taking Mr. Fletcher's deposition in the civil cases, and a statement offered against a party is not hearsay if it is the party's own statement. *See* Fed. R. Evid. 801(d)(2)(A). Likewise, Mr. Fletcher objected to Mr. Florez's testimony describing official IRS assessments or liens levied against the *Hofstetter* and *Davis* plaintiffs. Yet these IRS assessments or liens qualify as "[r]ecords, reports, ... or data compilations, in any form, of public offices or agencies, setting forth ... matters observed pursuant to duty imposed by law as to which matters there was a duty to report" admissible under the "public records and reports" exception to the hearsay rule. *See* Fed. R. Evid. 803(8); *Hughes v. United States*, 953 F.2d 531, 539-40 (9th Cir. 1992); *Perez v. United States*, 312 F.3d 191, 195 (5th Cir. 2002); 26 U.S.C. §§ 6201 *et seq.*

At oral argument, counsel for Mr. Fletcher expressed his specific concern about Mr. Florez's testimony regarding an investigative report produced during discovery in the *Davis* case. *See Davis*, 6 F.3d at 374-75. This was an internal report prepared by a private insurance company investigating Mr. Fletcher's actions during his

-12-

employ with that company. We note that, when Mr. Florez began to testify as to the contents of this memo, the district court sustained Mr. Fletcher's objection to this hearsay testimony. Mr. Fletcher remains concerned, however, that Mr. Florez still relied on that investigative report in describing how Mr. Fletcher's tax scheme operated. Indeed, it is true that on cross-examination Mr. Florez admitted that some of his information came from the deposition of the author of the investigative report, from documents produced in discovery in the *Davis* case, and from the tax returns, receipts, and statements of his clients.

After reviewing the record and Mr. Florez's testimony in context, we believe the admission of this hearsay testimony was, in any event, harmless error. Our careful examination of Mr. Florez's testimony convinces us that most of Mr. Florez's description of the tax scheme could plausibly be attributed to Mr. Florez's presence at Mr. Fletcher's deposition and Mr. Florez's review of a videotape of Mr. Fletcher promoting and explaining his services to prospective clients like the *Hofstetter* and *Davis* plaintiffs. Mr. Florez's conclusory comments that Mr. Fletcher's employer investigated and terminated him as a result of his tax scheme add very little to the information already before the jury in this case, namely, that Mr. Fletcher was held liable to approximately thirty plaintiffs for that very same tax scheme. We think, moreover, that the effect of Mr. Florez's hearsay statements about his clients deducting a parakeet as aerial surveillance and cat food as pest control do not begin to approach the effect of hearing those same suggestions directly from Mr. Fletcher, as the jury did when it viewed Mr. Fletcher's promotional video.

Mr. Fletcher maintains as well that the evidence of prior civil adjudications should have been excluded under Fed. R. Evid. 403 because it presented a threat of unfair prejudice or confusion that substantially outweighed its probative value. While the evidence of prior civil adjudications was no doubt prejudicial, Rule 403 "is concerned only with '*unfair* prejudice,' that is, 'an undue tendency to suggest decision

on an improper basis.' " *United States v. Yellow*, 18 F.3d 1438, 1442 (8th Cir. 1994) (quoting Fed. R. Evid. 403 advisory committee's note) (emphasis added). We note further that Rule 404(b) is a rule of inclusion, not exclusion, and "admits evidence of other crimes or acts relevant to any issue in the trial, unless it tends to prove only criminal disposition." *United States v. Claxton*, 276 F.3d 420, 423 (8th Cir. 2002) (internal quotations omitted).

In this case, the evidence of prior civil adjudications possessed significant probative value, especially with respect to establishing Mr. Fletcher's intent, knowledge, and motive, and we cannot say that the district court abused its discretion in concluding that the probative value was not substantially outweighed by the threat of unfair prejudice or confusion. The district court, moreover, instructed the jury that the evidence of other bad acts was not to be considered to prove the acts charged. "[U]nfair prejudice is unlikely to be found where the district court instructed the jury that the bad acts evidence was not to be used as proof that the defendant committed the charged offense." *United States v. Warfield*, 97 F.3d 1014, 1027 (8th Cir. 1996), *cert. denied*, 520 U.S. 1110 (1997).

V.

We reject Mr. Fletcher's challenge to the sufficiency of the indictment. 18 U.S.C. § 371 proscribes both general conspiracies to defraud the United States and conspiracies to commit specific offenses against the United States. Mr. Fletcher asserts that the indictment was defective because it charged him with a conspiracy to defraud, when the government was in fact trying to prosecute him for conspiring to commit a specific offense, that is, aiding and assisting in the preparation or presentation of false income tax returns.

Mr. Fletcher's reliance on *United States v. Minarik*, 875 F.2d 1186, 1193-95 (6th Cir. 1989), in support of his argument is misplaced. As we have previously

-14-

explained, "In *Minarik*, the Sixth Circuit held that the bill of particulars alleged and the facts proved at trial would only support a finding of conspiracy under the specific offense clause ... The Sixth Circuit ... placed great emphasis on the fact that the Government drastically changed its theory of prosecution as the case progressed." *Derezinski*, 945 F.2d at 1010.

The facts of *Minarik* serve to distinguish it markedly from the instant case. Here, the government has steadfastly asserted that Mr. Fletcher participated in a far-ranging *Klein* conspiracy to prevent the IRS from determining JO&C's clients' income and tax liabilities by both creating and inflating expenses. The government may have in fact had the discretion to charge Mr. Fletcher under 18 U.S.C. § 371 for a conspiracy that had the narrow purpose of preparing false tax returns. It is well settled, however, that when a defendant's conduct violates more than one criminal statute, as the evidence established that Mr. Fletcher's did, the government may elect the statute under which it will proceed. *See id.*

VII.

Mr. Fletcher also contends that the district court abused its discretion in sentencing him when it departed upward based on the inadequacy of his criminal history score. After Mr. Fletcher was convicted in this case, he pleaded guilty in the District of Montana to charges arising from the operation of his JO&C tax scheme in that state. Mr. Fletcher asserts that the district court in this case erred when it departed upward based on prior civil adjudications, because these same prior civil adjudications were the basis for an upward departure in the District of Montana. We find no merit in this argument.

Under the sentencing guidelines, "[i]f reliable information indicates that the criminal history category does not adequately reflect the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit

-15-

other crimes, the court may consider imposing a sentence departing from the otherwise applicable guideline range." U.S.S.G. § 4A1.3, p.s. Among the information that a district court may properly consider is prior similar civilly-adjudicated misconduct. U.S.S.G. § 4A1.3(c). Mr. Fletcher does not dispute that the conduct underlying his prior civil adjudications was similar to his conduct in this case. His argument, simply stated, appears to be that once the district court in Montana considered the civil adjudications as reliable information bearing on Mr. Fletcher's criminal history category, the district court in Arkansas could not consider them. Mr. Fletcher cites no authority, and we have found none, to suggest that the sentencing guidelines impose any such prohibition. We therefore conclude that the district court did not abuse its discretion by departing upward based on the same prior civil adjudications that the Montana district court used to depart upward.

## VII.

For the reasons indicated, we affirm Mr. Fletcher's convictions and sentence.


A true copy.


Attest:


CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-16-